**DAKOTA NATIONAL BANK AND TRUST CO., a National Banking Association, Appellant,**

v.

**FIRST NATIONAL BANK AND TRUST COMPANY OF FARGO, a National Banking Association, and James Smith, Comptroller of the Currency, Appellees.**

No. 76–1585.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 14, 1977.

Decided April 14, 1977.

Rehearing and Rehearing En Banc Denied May 16, 1977.

John D. Kelly (argued) and Beryl J. Levine, Fargo, N. D., on brief, for appellant.

Mark N. Mutterperl, Atty., App. Section, Civil Div., Dept. of Justice (argued), Rex E. Lee, Asst. Atty. Gen., Washington, D. C., Harold O. Bullis, U. S. Atty., Fargo, N. D., and Leonard Schaitman, Washington, D. C., on brief, for appellee, Comptroller of the Currency.

Charles A. Feste (argued) and Wickham Corwin, Fargo, N. D., and Rodger Nordbye, Minneapolis, Minn., on brief, for appellee First Natl. Bank & Trust Co. of Fargo.

David O. Lee, Sp. Asst. Atty. Gen., Dept. of Banking & Financial Institutions, Bismarck, N. D., on brief, for amicus curiae, State Banking Bd.

Before LAY and ROSS, Circuit Judges, and WANGELIN, District Judge.*

ROSS, Circuit Judge.

This appeal again presents to the court a question of the proper construction of 12 U.S.C. § 36, the branch banking law. Dakota National Bank & Trust Co. (Dakota National) initiated this action to protest a decision of the Comptroller of the Currency to award the First National Bank and Trust Company of Fargo (First National) a branch certificate for its newly proposed branch facility at University Drive and Twenty-eighth Avenue in the city of Fargo.

* H. Kenneth Wangelin, United States District Judge for the Eastern District of Missouri, sitting by designation.

From an adverse decision by the district court sustaining the Comptroller, Dakota National appeals to this court.

*The Facts.*

First National and Dakota National both maintain a main banking house in Fargo, North Dakota, respectively at 15 Broadway and 51 Broadway in that city. Dakota National also operates a branch authorized by the Comptroller at 1501 South University Drive. The legality of First National's proposed University Drive location is brought into question by Dakota National because First National also maintains the "Auto Bank" at 404 Main Avenue, which had previously operated as a certified branch and which, Dakota National contends, constitutes the one and only lawful branch permitted by North Dakota law.

According to the administrative files of the Comptroller of the Currency which were submitted by the plaintiff, First National made application on September 14, 1971, for permission to operate a "branch" bank drive-in facility at Main Avenue and Fourth Street South at a distance of 1,075 feet from the main banking facility. The application stated that First National's present drive-in facility, which was then a part of the main office, was "in serious jeopardy due to imminent prohibition of left-turns by vehicle traffic from Broadway and the eventual curtailment of all vehicular traffic on Broadway." The investigative report on the branch application compiled by the office of the Regional Administrator of National Banks discloses that proposed services at the Auto Bank were to include, among other things, deposits and withdrawals from checking and savings accounts. North Dakota state branching laws, the substantive provisions of which are applicable to national banks as well, at that time allowed a bank to "maintain and operate *separate and apart from its bank-*ing house one facility for drive-in and walk-up service, whereat the services rendered shall be limited to receiving deposits of every kind and nature, cashing checks or orders to pay, issuing exchange, and receiving payments payable at the bank." N.D. Cent.Code § 6–03–13.1 (emphasis added). The facility was required to be no more than 1,500 feet from the main banking house. N.D.Cent.Code § 6–03–13.2. The First National gave published notice of its intention to establish a branch, and on October 27, 1971, the bank was notified that its "application to establish a branch," the Auto Bank, had been approved by the office of the Comptroller.

The Auto Bank branch opened for business in 1972 and operated as a branch until 1974, when, on July 25, 1974, First National's president submitted a proposal to the Comptroller to have the Auto Bank *recharacterized* as an "extension" of the main bank, rather than a certified "branch." The bank president cited as reasons for the change, *inter alia,* the fact that the only structure separating the main and Auto Bank was a seed warehouse located on a railroad right-of-way; that at the time the Auto Bank was constructed "economics and customer convenience" required that it not be closer to the main banking house; and, finally, that only *"550 feet"* separated the auto and main bank facilities.[1] In an *ex parte* decision on December 23, 1974, the Comptroller gave his concurrence, the branch was recharacterized as an extension, and the First National relinquished its auto branch certificate.

In an affidavit submitted to the district court pursuant to cross summary judgment motions, Deputy Comptroller Blanchard recounted the reasons for which his permission was given:

> (a) First National was unable to continue to provide drive-up service for its

---

1. The discrepancy in distance between the two buildings apparently results from the method employed in making the measurement. According to the trial court "[i]f measured in a straight line, the distance is approximately 550 feet. Plaintiff would measure the distance as approximately 1250 feet by following the usual route of travel between the two points." *Dakota Nat'l Bank & Trust Co. v. First Nat'l Bank & Trust Co.,* 414 F.Supp. 1161, 1172 n. 7 (D.N.D.1976).

customers at its main office in 1971 because of urban renewal plans to turn the sole access street into a pedestrian walkway;

(b) Discontinuation of drive-up service would subject First National's customers to the inconvenience of "horse and buggy day banking" after they had become accustomed to the convenience and efficiency of the drive-up service now routinely provided by banks throughout the nation;

(c) Physical modifications to the existing main office premises to provide drive-up service were unfeasible;

(d) No other property contiguous to First National's main office premises was available for expansion;

(e) The only reasonably available premises upon which First National could continue to provide drive-up service to its customers was a tract of land located approximately 550 feet (168 meters) from the existing main office premises, and, out of necessity, this was purchased for the purpose of relocating the unusable drive-up installation;

(f) The only intervening structure at ground level was a building scheduled to be razed pursuant to urban redevelopment plans;

(g) The only intervening property was a railroad easement and a dedicated street;

(h) The drive-up installation would continue to provide limited service to First National's existing customers in the main office service area;

(i) All transactions entered into at the drive-up installation would be processed at the main office;

(j) The drive-up installation would be completely dependent upon the main office and could function only in conjunction with the main office to enable First National to continue to provide modern, convenient service to its existing customers; and

(k) The operation of the drive-up installation had resulted in no injury to any of First National's competitors and had not affected the competitive balance in the market.

6. In determining whether an additional installation, adjunctive to an existing main office, amounts to the establishment of a branch or merely an extension of the existing main office premises, the Comptroller of the Currency examines all of the facts and circumstances surrounding the additional installation.

7. The factors weighed by the Comptroller of the Currency include, but are not limited to, the distance separating the additional and existing installations, the presence or absence of any intervening structures, the presence or absence of any physical connection, the economic effect of the additional installation upon the balance of the competition within the banking community, and the feasability [sic] of placing the additional installation closer to the existing office. No single factor is controlling.

Meanwhile, in 1973, the North Dakota legislature amended its branch banking law to permit a branch to locate within the *corporate city limits* of the main banking house or within *three miles* of such city if it were not within the corporate limits of another city. N.D.Cent.Code § 6–03–13.1 (1975). Concluding that it was operating without a separate facility after the recharacterization of the Auto Bank on December 23, 1974, First National made application on December 26, 1974, to establish a *branch* bank on University Drive.

The State Commissioner of Banking learned of the application and responded by writing to the Regional Administrator of National Banks on January 24, 1975, expressing the opinion that the proposed branch would violate federal law and state law, which "specifically limits that only one facility separate and apart from its banking house is authorized." Dakota National Bank also announced its opposition and on February 6, 1975, requested a hearing in connection with the application; the hearing request was granted by the office of the

Regional Administrator on February 10, 1975.

At the February 28 hearing, which was conducted pursuant to rules in 12 C.F.R. § 5, Mr. Elder, counsel for the Regional Administrator, announced that the hearing would be limited to "the presentation of factual matters concerning the subject branch. It is not the purpose * * * to air legal issues * * *." Though most of the hearing, through both parties' presentations, was devoted to economic issues and the propriety of a bank branch in the south Fargo area, Dakota National was permitted, over First National's relevancy objection, to present some evidence concerning the Auto Bank and its recharacterization by the Comptroller as an extension. In May 1975 the Deputy Comptroller approved First National's University Drive branch application, and subsequently in February 1976 Dakota National, seeking injunctive and declaratory relief against the Comptroller and First National, filed suit in federal district court, arguing that the Comptroller's approval of First National's application was "arbitrary, capricious and unlawful," and requesting the district court to determine the "legality of the proposed First National branch facility in south Fargo." The district court subsequently dismissed Dakota National's petition. We reverse.

*Standard of Review.*

An initial question for the court concerns the district court's use of the "arbitrary and capricious" standard of review of the Comptroller's order, and the appellees' argument for its use by this court.

First, it should be clarified which issues are not presented by this appeal. The district court did not decide, and we do not here, the propriety of establishing a branch bank on University Drive; nor does either party contest the fact that the proposed facility would constitute a *branch* as a matter of federal law and would require certification as such. What is contested is the legality of that branch in view of the exist-ence of the 404 Main Avenue Auto Bank facility which, from appellant's viewpoint, constitutes the one and only branch authorized by North Dakota law. This court is, then, primarily concerned with the recharacterization of the Auto Bank from branch to extension, for it is that question which ultimately determines the legal status of the newest facility in south Fargo.

In determining the legal status of the Auto Bank, including a judicial interpretation of the term "branch" bank, 12 U.S.C. § 36(f), we are confronted *primarily* with a question of law, which if incorrectly decided in an earlier stage of the proceedings, is subject to correction in an appeal to this court. *Dunlop v. Haybuster Manufacturing Co. & Occupational Safety & Health Review Commission*, 524 F.2d 222, 224 (8th Cir. 1975). The district court relied on the Supreme Court opinion, *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) in holding that the "arbitrary and capricious" standard of review was applicable to the factual determinations which the Comptroller has made in this case and to matters which are committed to the Comptroller's discretion. In *Camp v. Pitts, supra*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 the Court was reviewing the Comptroller's denial of an application to establish a new bank. The Comptroller had found, as a factual conclusion, that a new bank would be "an uneconomic venture in light of the banking needs and the banking services already available in the surrounding community." *Camp v. Pitts, supra*, 411 U.S. at 143, 93 S.Ct. at 1244. The Supreme Court held that the appropriate standard of review was whether that discretionary determination was "arbitrary, capricious, an abuse of discretion, or *otherwise not in accordance with the law* * * *." *Camp v. Pitts, supra*, 411 U.S. at 142, 93 S.Ct. at 1244 (emphasis added).

However, in the present case we are concerned primarily with a determination of law.[2] Questions of law such as the one

---

2. The "substantial evidence test" and the "arbitrary and capricious standard" of 5 U.S.C. § 706 "[b]oth are used for review of findings of fact * * *." K. Davis,

in this case, which involve the judicial interpretation of the statutory term "branch bank," may be reviewed *de novo* by both the district court and the appeals court. The Ninth Circuit made this distinction in regard to questions of law in *Seattle Trust & Savings Bank v. Bank of California,* 492 F.2d 48 (9th Cir. 1974).

We consider first the question raised concerning the proper standard of judicial review of the Comptroller's decision. Although this issue was not clearly presented or determined in the trial court, it does appear from the record that the District Court adopted the view urged by the Bank of California and the Comptroller that the Courts should uphold the Comptroller's administrative ruling unless he acted "unreasonably, arbitrarily and capriciously" in construing applicable statutes. Although this standard apparently was applied by the District Court, *we deem the proper standard of review to have been a de novo determination of the legal issues involved herein.* We consider the determination in the trial court to have accomplished a result entirely consistent in approach and result with the de novo review requirement.

*The arbitrary and capricious standard has been judicially fashioned to protect against the wrongful exercise of discretion by the Comptroller regarding factual controversies.* In this case, however, the principal issue was whether the Comptroller has acted within the limitations imposed upon him by federal and state law, not whether he has acted reasonably or unreasonably. *If the Comptroller was incorrect in his interpretation of the law, he should have been overruled in the District Court. First National Bank of Lo-*

Administrative Law of the Seventies § 29, at 647 (1976).

3. *Mid-West Nat'l Bank v. Comptroller, of Currency,* 296 F.Supp. 1223 (N.D.Ill.1968) a branch banking case which was cited by the *en banc* opinion of the court in *Nebraskans for Independent Banking v. Omaha Nat'l Bank,* 530 F.2d 755, 761 (8th Cir. 1976), *vacated and remanded,* 426 U.S. 310, 96 S.Ct. 2616, 48 L.Ed.2d 658 (1976), held:

*gan, Utah v. Walker Bank & Trust Co.,* 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343, reh. den., 385 U.S. 1032, 87 S.Ct. 738, 17 L.Ed.2d 680 (1966). This standard of review has been customarily applied to cases involving interpretation of 12 U.S. C.A. § 36(c). *See First National Bank v. Dickinson,* 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1966).[3]

*Id.* at 50 (emphasis added).

Therefore, we will examine the legal questions presented by this appeal *de novo,* "paying due regard to any factual determinations made by the Comptroller in reaching his decision, and the record which was before him." *Mid-West National Bank v. Comptroller of Currency,* 296 F.Supp. 1223, 1226 (N.D.Ill.1968).

*Branch Banking.*

*First National Bank v. Dickinson,* 396 U.S. 122, 134, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969) established that the definition of a branch bank is a threshold question to be determined as a matter of federal law. Two elements comprise the federal definition of branch bank as outlined by the Court in *First National Bank v. Dickinson, supra,* 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312; they relate generally to (1) the *types of services* offered and (2) to the *location* of a facility.

The Supreme Court's judicial construction of "branch" emanates from the federal statute which provides:

(f) The term "branch" as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business * * * at which deposits

Determinations of such legal issues do not involve the exercise of discretion, unlike issues within the Comptroller's peculiar expertise in the field of banking. Since legal issues are here in dispute, the Court, in effect, must review them *de novo,* paying due regard to any factual determinations made by the Comptroller in reaching his decision, and the record which was before him.
*Id.* at 1226.

are received, or checks paid, or money lent.

McFadden Act, 12 U.S.C. § 36(f).

▪▪▪ Recognizing that the definition suggests a calculated indefiniteness as to the outer limits of the term, the Supreme Court has concluded that at the very least the federal definition will include any place for receiving deposits or paying checks or lending money apart from the chartered premises. *First National Bank v. Dickinson, supra,* 396 U.S. at 135, 90 S.Ct. 337. Since the "services offered" element of the definition is written in the disjunctive, the offering of any one of the three services will provide the basis for finding that "branch" banking is taking place. This interpretation is undoubtedly in line with legislative intent. In his analysis of § 36(f) at the time of its enactment Representative McFadden explained:

> [Section 36(f)] defines the term "branch." *Any place outside of or away from the main office* where the bank carries on its business of receiving deposits, paying checks, lending money, or *transacting any business carried on at the main office,* is a branch if it is legally established under the provisions of this act.

*Independent Bankers Association v. Smith,* 534 F.2d 921, 931 (D.C.Cir.1976), *cert. denied,* 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 141 (1976), *quoting* 68 Cong.Rec. 5816 (1927), (footnote omitted) (emphasis added). It is undisputed, and the district court so notes, "that deposits are received and checks paid at the 4th and Main facility," an admission which easily places the facility within the first half of the broad federal equation. In decisions since this court's *en banc* decision on branch banking, *Nebraskans for Independent Banking v. Omaha National Bank,* 530 F.2d 755 (8th Cir. 1976), *vacated and remanded,* 426 U.S. 310, 96 S.Ct. 2616, 48 L.Ed.2d 658 (1976), our court has concluded that the part of the definition relating to "services offered" applies equally to *machines* that are "capable of receiving deposits and crediting the amount deposited", *Missouri ex rel. Kostman v. First National Bank,* 538 F.2d 219, 220 (8th

Cir. 1976), *cert. denied,* 429 U.S. 941, 97 S.Ct. 357, 50 L.Ed.2d 310 (1976), and *trust account services* offered at a separate facility where it was "apparent that these enumerated activities are also carried on routinely at Mercantile's main office." *St. Louis County National Bank v. Mercantile Trust Co.,* 548 F.2d 716, 719 (8th Cir. 1976). "This alone would clearly bring Mercantile's Clayton office within the branch definition as declared by Representative McFadden's own analysis of section 36(f) at the time of its adoption." *Id.* The Supreme Court has spoken less definitely as to when a facility, as a matter of federal law, is "apart from the chartered premises." In *First National Bank v. Dickinson, supra,* 396 U.S. at 122, 90 S.Ct. 337, where customers of a national bank could deliver sums of money to an armored truck or a stationary receptacle, the Court concluded that "[s]ince the putative deposits are *in fact* 'received' by a bank facility *apart from its chartered place of business,* we are compelled, in construing § 36(f), to view the place of delivery of the customer's cash and checks accompanied by a deposit slip as an 'additional office, or * * * branch of place of business * * at which deposits are received.'" *Id.* at 137, 90 S.Ct. at 345 (footnote omitted) (emphasis added).

More specifically, this circuit was confronted with a strikingly similar set of facts in the *Nebraskans* case, *supra,* which we find controlling here. *As a matter of law* the Omaha National Bank facility was found to be "apart from the chartered premises":

> It is undisputed that deposits are received and checks paid at the 18th and Douglas facility, and Omaha National concedes that loan applications are accepted there as well. Further, it cannot be seriously disputed that a free-standing facility located around the corner, one block up and across the street, from the main bank's south entrance on Farnam Street, even if connected by a pneumatic tube, is one located "apart from the chartered premises" as a matter of law. The bank's main entrance is yet further from the facility, around two corners on 17th Street to the

east. There is no west entrance directly into the main bank from 18th Street for the reason that the bank on the ground floor is located only in the east half of the Woodmen Tower lobby.

*Nebraskans for Independent Banking v. Omaha National Bank, supra,* 530 F.2d at 763 (footnote omitted).

█ The facts in this case are even more compelling for concluding that the facility is "separate and apart" from the main banking house. According to the district court it is not disputed that the facility is free standing; the Auto Bank is located some two blocks distant from the main bank. Unlike the *Nebraskans* case, not even a pneumatic tube connects the main bank and the Auto Bank. The district court found that "the *only* physical connection between the Auto Bank and the main office is a direct telephone line." (Emphasis added.) The district court and the Comptroller, nevertheless, concluded that the Auto Bank was an "extension" and not a branch bank by relying on a list of six judicially conceived "factors" for identify-

ing a branch.[4] The role of these six factors was, however, greatly limited in the *Nebraskans* case and subordinated there to the *statutory definition* of branch and the *principle of competitive equality. Nebraskans for Independent Banking v. Omaha National Bank, supra,* 530 F.2d at 761.[5] This court has called these factors only aids to the fact-finder; they are certainly not decisive in light of the primary sources of the definition.

█ The doctrine and policy of competitive equality is firmly imbedded in the Act and therefore relevant to the construction of its terms and the application of its provisions. Through that doctrine Congress sought to make state and national banks equal and competitive in their ability to participate in branching activities. This is accomplished through the medium of state branching law whose provisions are made applicable by federal law to the national banks. The McFadden Act so provides:

(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new

---

4. "The cases considering the factual question whether a given national bank facility is a 'branch' have identified the number of factors to be assessed in making the determination. They include (1) the distance separating the main bank from the added facility; (2) the presence or absence of intervening structures; (3) the physical connection, if any, between the main bank and the facility; (4) the effect upon the balance of competition (that is, whether the facility expands in a material way customer access to banking services in a location not previously served so as to give a material competitive advantage in securing customers); (5) the availability of other locations for attached expansion; and finally (6) the dependence of the facility upon the main bank in day-to-day banking operations." *Nebraskans, supra* at 760–761 (Footnote omitted).

*Dakota Nat'l Bank & Trust Co. v. First Nat'l Bank & Trust Co., supra,* 414 F.Supp. at 1172.

5. The Eighth Circuit opinion in *Nebraskans for Independent Banking v. Omaha National Bank, supra,* 530 F.2d 755, was vacated by the Supreme Court on June 7, 1976, 426 U.S. 310, 96 S.Ct. 2616, 48 L.Ed.2d 658 (1976), in light of new state legislation which redefined the auxiliary teller facilities which a state bank may

operate. Legislative Bill 763 provided that "any bank may maintain an attached auxiliary teller office, if such teller office is physically connected by a pneumatic tube or tubes, or a walkway, tunnel, or any other mechanical or structural connection or attachment for the public use of the bank and is within two hundred feet of the building containing the premises specified as its place of business in its charter and is not within three hundred feet of another bank or another bank's auxiliary or detached teller office."

The Supreme Court may have felt the *branch* would no longer be a "detached" facility as a matter of *state law.* In *First Nat'l Bank v. Dickinson,* 396 U.S. 122, 133, 90 S.Ct. 337, 343, 24 L.Ed.2d 312 (1969) the Court said: "[t]he mechanism of referring to state law is simply one designed to implement that congressional intent [competitive equality] and build into the federal statute a self-executing provision to accommodate to changes in state regulation."

On November 30, 1976, the Nebraska district court (Judge Robert V. Denney) invalidated this new Nebraska legislation on grounds not pertaining to the branch banking question.

branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.

12 U.S.C. § 36(c). Of this section the Supreme Court has said that "Congress entrusted to the States the regulation of branching as Congress then conceived it." *First National Bank v. Dickinson, supra,* 396 U.S. at 133, 90 S.Ct. at 343. It is clear then that a national bank may *operate* a facility such as the one at issue here only *if,* and to the extent, state law permits it for state banks. However, we reemphasize, that the primary determination of whether or not that facility *is* a branch is a matter of federal law. *Id.* at 134, 90 S.Ct. 337.

North Dakota has not permitted extensive branching by its banks:

> 6–03–13.1. *Separate drive-in facility authorized.*—Every bank organized under chapter 6–02, and under the supervision of the state banking board, and any national bank doing business in this state, may, upon compliance with sections 6–03–13.1 through 6–03–13.4, maintain and operate *separate and apart from its banking house one facility for drive-in and walk-up service, in addition to such service at its main banking house,* and at its paying and receiving stations, if any. Such facility shall be within the corporate city limits of the main banking house or

within three miles of such city but shall not be within the corporate limits of another city. The services rendered at the separate facility shall be limited to receiving deposits of every kind and nature, cashing checks or orders to pay, issuing exchange, and receiving payments payable at the bank.

> Source: S.L.1963, ch. 96, § 1; 1973, ch. 66, § 1.

> 6–03–13.2. *Further limitations upon facility.*—No bank may maintain or operate under sections 6–03–13.1 through 6–03–13.4:

> 1. More than one such facility separate and apart from its banking house, * * *.

N.D.Cent.Code §§ 6–03–13.1; 6–03–13.2 (emphasis added).

■■■ The district court concluded and the parties apparently agree that no authoritative interpretation of this statute, by the Supreme Court of North Dakota, exists. Nor are there administrative regulations which expand the statutory provisions as in the *Nebraskans* case. The statute alone must be construed, and while deference is usually given to a district court's interpretation of state law, *Nebraskans for Independent Banking v. Omaha National Bank, supra,* 530 F.2d at 762, we are unable to do so here. The district court gave no reason whatsoever for its conclusion that in its view "a state bank in circumstances similar to that in which the First National has found itself would be permitted to operate similar facilities." Nor do we agree with the district court that, unlike the *Nebraskans* case, the Comptroller had before him no evidence that the State Banking Commissioner questioned the legality of operating both facilities. The State Banking Commissioner's letter to the Comptroller was clear;[6] the Comptroller duly noted in

---

**6.** The Commissioner's January 1975 letter stated:

> It would appear that the First National Bank & Trust Company, Fargo, North Dakota, if the Comptroller granted the branch as applied for at University Drive South be-

tween twenty-eighth and twenty-ninth avenues in Fargo, Cass County, North Dakota, would be in violation of Section 5155(c) B. Branches of National Banks. Federal Reserve Act, Section 6–03–13.2, North Dakota Century Code, specifically limits that only one

his files that "Commissioner Ellwein contested the legality of this application."

■ In any event, we find the words of the North Dakota statute plain and clear. A state bank is allowed one drive-in and walk-up facility *at the main bank*; it is allowed *one* other, "separate and apart" from the main bank. The statute quite clearly distinguishes the two allowable drive-in/walk-up facilities on the basis of their physical proximity to the main banking facility.

■ The state Commissioner's view, supported in this court by the State Banking Board, that First National would be impermissibly operating two separate and apart facilities, supports our similar conclusion. And "[w]hile the state director's view is not dispositive, it is certainly illuminating on the extent to which a state bank could extend its operation under * * * [state] law * * *." *Nebraskans for Independent Banking v. Omaha National Bank*, *supra*, 530 F.2d at 762.

Our conclusion fosters the policy of competitive equality which Congress desired and which it implemented by establishing a broad definition of "branch" and by making state branching privileges and limitations applicable to nationally-chartered banks. We do not agree with the district court that the policy of competitive equality should be implemented by the Comptroller's assessment in a particular case of the projected economic impact of the facility or its "relatively" close physical proximity to the main bank. We conclude that the 404 Main Avenue Auto Bank facility is a branch, and that

facility separate and apart from its banking house is authorized.

The trial court noted that the Commissioner had also submitted a brief contrary to the position of the Comptroller but that the "North Dakota State Banking Board is the administrative agency responsible for approving separate facilities for state banks. The Commissioner is not an administrative agency and he has no authority to act separately from the State Banking Board in an individual capacity."

In this court an amicus brief was filed on behalf of the North Dakota State

the First National is impermissibly operating *two* "separate and apart" facilities for drive-in and walk-up services by its addition of the University Drive location.

*The Bank of North Dakota.*

■ We agree with the district court in its decision with respect to the unusual Bank of North Dakota. The Bank of North Dakota is the banking institution of the State of North Dakota.

6–09–01. *Purpose and establishment of Bank of North Dakota.*—For the purpose of encouraging and promoting agriculture, commerce, and industry, the state of North Dakota shall engage in the business of banking, and for that purpose shall maintain a system of banking owned, controlled, and operated by it, under the name of the Bank of North Dakota.

N.D.Cent.Code § 6–09–01 (1975). The Bank may receive deposits from any source; all state funds must be deposited there and according to material submitted by the Comptroller in its brief, 75 percent of its deposits are those of the state of North Dakota; it is subject to a number of restrictions and afforded some privileges. *See* N.D.Cent.Code §§ 6–09–01 to 6–09–34. Appellees have argued that the statute printed above plus § 6–09–02 ("[t]he industrial commission shall operate * * * the Bank of North Dakota, locate and maintain its *places of business* * * * *" (emphasis added)) authorize this bank to engage in unlimited branch banking, and that as a matter of competitive equality, national banks should enjoy the same privilege.

Banking Board by its counsel, Special Assistant Attorney General, which takes the same position as the Commissioner. Although the trial court may have been technically correct in stating that "the Comptroller had no indication that the North Dakota State Banking Board, the sole authorizing agency, would not allow a state bank to operate facilities similar to those requested by First National," the letter certainly was sufficient to advise him of the statutes involved and to alert him to the legal issue presented thereby.

The McFadden Act provides the following definition of a "state bank" for the purposes of the Act:

The words "State bank," "State banks," "bank," or "banks," as used in this section, shall be held to include trust companies, savings banks, or other such corporations or institutions carrying on the banking business under the authority of State laws.

12 U.S.C. § 36(h). The definition obviously does not address the specific problem of a *state-owned* bank as a bank operating "under the authority of State laws." However, the character of the Bank of North Dakota, as interpreted by the district court and with which we agree, is that of an agency of the sovereign power. It is in effect an arm of the state of North Dakota. It would be inimical to the policy of *competitive equality* to accord privately-owned, *nationally*-chartered banks the same privileges given to the sovereign when they are denied to privately-owned, state-chartered banks. We are persuaded that competitive quality was intended to be maintained between the privately-owned banking institutions, state and federal, rather than between the national banks and the *state itself* in its banking endeavors. As such, we do not include the Bank of North Dakota within the definition or meaning of §§ 36(h) or 36(c). We express no opinion as to whether the Bank of North Dakota has unlimited branching powers under state law.

*Conclusion.*

The Comptroller identified the First National Auto Bank as an "extension" as a result of his misunderstanding of the applicable law; the district court upheld the Comptroller's conclusion by applying an erroneous standard of review to the interpretation of statutes by the Comptroller. As we have concluded that the Auto Bank facility is a branch and, as such, subject to the state's restrictions on branch banking, we accordingly direct that the Comptroller of the Currency be enjoined from issuing a certificate for operation of the University Drive facility. Reversed and remanded for further proceedings consistent with this opinion.