**COMMUNITY BANKERS ASSOCIATION OF INDIANA, INC., Plaintiff,**

v.

**Robert L. CLARKE in his official capacity as the Comptroller of the Currency of the United States, and the Indiana National Bank, Defendants.**

**The DEPARTMENT OF FINANCIAL INSTITUTIONS OF the STATE OF INDIANA, Plaintiff,**

v.

**Robert L. CLARKE, Comptroller of the Currency of the United States, and Indiana National Bank, Defendants.**

**No. IP90–335C.**

United States District Court, S.D. Indiana, Indianapolis Division.

Dec. 13, 1990.

---

Terry G. Duga, Office of the Atty. Gen., Indianapolis, Ind., for Dept. of Financial Institutions of State of Ind.

Jon D. Krahulik, Jonathan L. Birge, Nana Quay–Smith, Bingham, Summers, Welsh & Spilman, Indianapolis, Ind., for Community Bankers Ass'n of Indiana, Inc.

Thomas A. Withrow, B. Keith Shake, David J. Bodle, Richard R. Dykhouse, Henderson, Daily, Withrow & Devoe, Indianapolis, Ind., for Indiana Nat. Bank.

Marcia K. Sowles, Theodore C. Hirt, Dept. of Justice, Civ. Div., Washington, D.C., Deborah J. Daniels, Jeffrey L. Hunter, Office of U.S. Atty., Indianapolis, Ind., for Comptroller of the Currency.

## ENTRY

BARKER, District Judge.

At issue in this litigation is the propriety of the Comptroller of the Currency's approval of an application by defendant Indiana National Bank to open a branch bank in Monroe County, Indiana. Currently before the court are motions by each of

the parties for summary judgment.[1] For the reasons discussed below, the motions of the defendants are granted.

## I. Background

On July 24, 1987, Indiana National Bank ("INB"), of Indianapolis, Marion County, Indiana, filed an application with the Comptroller of the Currency to establish a branch in Bloomington, Monroe County, Indiana. This application was opposed by various parties including the Community Bankers Association of Indiana ("CBA") and the Indiana Department of Financial Institutions ("DFI"), plaintiffs herein. The Comptroller considered the arguments made by these parties but nonetheless granted INB's application on March 16, 1990.

DFI filed a Verified Complaint for Declaratory Judgment and Injunctive Relief on March 30, 1990, seeking this court's review of the Comptroller's decision. CBA filed a similar complaint on the same day. These cases were consolidated pursuant to court order dated May 14, 1990. As noted above, each of the parties has filed a motion for summary judgment.

## II. Discussion

The provisions of the National Bank Act governing the ability of national banks to branch (commonly referred to as the McFadden Act) state in part:

> A national bank association may, with the approval of the Comptroller of the Currency, establish and operate new branches ... at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location

> imposed by the law of the State on State banks.

12 U.S.C. § 36(c).

The Comptroller examined Indiana law and found that state-chartered commercial banks are only allowed to branch in those counties contiguous to the county in which the bank's principal office is located. IC 28-2-13-20. Had this provision of Indiana law been applied, INB's application would have been rejected, as the county in which the proposed branch is to be located, Monroe County, is not contiguous with that of INB's principal office, Marion County.

However, the National Bank Act contains this definition:

> The words "State bank," "State banks," "bank," or "banks," as used in this section, shall be held to include trust companies, savings banks, or other such corporations or institutions carrying on the banking business under the authority of State laws.

12 U.S.C. § 36(h).

The Comptroller considered applicable case law and found that this National Bank Act definition encompassed Indiana building and loan associations. The Comptroller reached this result by rejecting a state law definition of the words "state bank" and instead applying a functional analysis to determine that Indiana building and loan associations are authorized to and do carry on banking activities. Having found that the term "state bank" includes Indiana building and loan associations, the Comptroller accordingly determined that national banks could branch to the same extent as could these building and loan associations, which under Indiana law is statewide. IC 28-4-3-2(a). The Comptroller concluded that INB had met the other requirements pertaining to the establishment of a branch (these findings not being at issue here). The Comptroller therefore approved INB's application.

■ The crux of this litigation is whether the Comptroller was correct in applying

---

**1.** Plaintiff Community Bankers Association of Indiana, Inc. originally filed a motion for preliminary injunction on April 30, 1990, which it subsequently converted into a motion for summary judgment on May 14, 1990.

a functional definition to the term "state bank," as contained in the McFadden Act, 12 U.S.C. § 36. Despite CBA's contention that this question of law should be reviewed on the merits freely by this court, the Supreme Court has made quite clear that deference is due the interpretations of the Comptroller.

> It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of the statute. The Comptroller of the Currency is charged with the enforcement of the banking laws to an extent that warrants the invocation of this principle with respect to his deliberative conclusions as to the meaning of those laws.

*Investment Company Institute v. Camp*, 401 U.S. 617, 626–27, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971) (citation omitted); *see also Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 404, 107 S.Ct. 750, 759–760, 93 L.Ed.2d 757 (1987) (same).

"We are charged to uphold the Comptroller's determination if we find it to be a 'permissible construction' of the National Bank Act." *Dep't. of Banking and Consumer Finance v. Clarke*, 809 F.2d 266, 269 (5th Cir.1987) ("Deposit Guaranty"), *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3240, 97 L.Ed.2d 745 (1987) (citations omitted).

The Comptroller determined that that portion of the McFadden Act defining state banks as "corporations or institutions carrying on the banking business under the authority of State laws," 12 U.S.C. § 36(h), was a functional definition. Thus, a financial institution which actually performed "the banking business," as traditionally understood, would be considered a state bank for purposes of 12 U.S.C. § 36(c), regardless of the name assigned to this institution under state law. The Comptroller based the determination of what constituted "the banking business" upon "the traditional powers and functions outlined in 12 U.S.C. § 24 (Seventh).... In defining the 'banking business', the Comptroller and the courts have embraced a flexible definition which includes accepting deposits, making loans and performing credit exchange func-

tions." Decision of the Comptroller of the Currency on the Application of Indiana National Bank of Indianapolis, Marion County, Indiana, to Establish a Branch in Bloomington, Monroe County, Indiana, March 16, 1990, pages 20–21 (citations omitted).

The Comptroller cited recent precedent in support of this approach. The Fifth Circuit was the first court of appeals to agree with the Comptroller that state chartered savings and loans were state banks for purposes of the McFadden Act because they were carrying on the banking business, thus allowing Deposit Guaranty National Bank to avail itself of the statewide branching provisions applicable under Mississippi law to state-chartered savings and loans. *Deposit Guaranty*. This functional approach was followed by other federal courts whose decisions were relied upon by the Comptroller. *See, e.g., Volunteer State Bank v. National Bank of Commerce*, 684 F.Supp. 964 (M.D.Tenn.1988) (national bank allowed to branch under statute applicable to state-chartered savings and loans where such institutions functioned as banks), *Texas v. Clarke*, 690 F.Supp. 573 (W.D.Texas 1988) (same). In addition, each of the defendants submitted to the court a recent decision of the Eighth Circuit also following the functional approach adopted by the Fifth Circuit. *See Independent Bankers Ass'n v. Clarke*, 917 F.2d 1126 (8th Cir.1990).

The plaintiffs argue, among other things, that the Comptroller's approach does not accord appropriate deference to state law as called for by the McFadden Act. It cannot be disputed that Congress intended to let branching by national banks depend to some extent on the authority provided by state law. 12 U.S.C. § 36(c), *First Nat'l Bank of Logan v. Walker Bank & Trust Co.*, 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966). In *Logan*, the Supreme Court held that under the McFadden Act state law determines not only whether a national bank may branch and where but also the method by which the bank may branch, as such a restriction is "part and parcel" of state policy. *Id.*, 385 U.S. at 262, 87 S.Ct. at 497. In so ruling, the Court rejected the Comptroller's argument that the state stat-

ute which restricted branching to the taking over of preexisting banks should not apply to national banks. The Court noted, "It is a strange argument that permits one to pick and choose what portion of the law binds him." *Id.*, 385 U.S. at 261, 87 S.Ct. at 497. Accordingly, the plaintiffs argue that the distinctions made under Indiana law between banks and building and loans must not be disregarded in determining the extent to which INB may branch.

Nonetheless, there are limits on the extent to which the McFadden Act requires reliance upon state law. For example, the Supreme Court ruled in *First Nat'l Bank in Plant City v. Dickinson*, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1970), that the McFadden Act's policy of "competitive equality" between state and national banks mandates use of a federal law definition of the term "branch." Our dilemma remains to determine where between *Logan* and *Plant City* this case lies.

The plaintiffs cite decisions where state law, rather than a functional approach, was used in the definition of a state bank. In *Mutschler v. Peoples Nat'l Bank of Washington*, 607 F.2d 274 (9th Cir.1979) (per curiam), the court applied state law definitions of financial institutions in reaching its conclusion that Peoples National Bank could only branch under the branching authority accorded to state commercial banks and not under the authority given to mutual savings banks. The court noted at the end of its opinion that there was an increasing overlap in functions performed by savings and commercial banks. *Id.* at 280. However, the court did not consider taking a functional approach in its analysis, maintaining instead that savings and commer-

cial banks were legally distinct creatures and that the policy of competitive equality between state and national banks in the McFadden Act precluded any other analysis. *Id.* The court's failure to give more than one paragraph's worth of treatment to the merits of a functional approach is quite understandable in light of the fact that this opinion was issued in 1979, thus predating the Depository Institutions Deregulation and Monetary Control Act of 1980 [2] and the Garn–St. Germaine Depository Institutions Act of 1982 [3]. These two laws deregulated the savings and loan industry and thereby increased the functional similarities between savings and loans and commercial banks to an unprecedented extent.[4] While the *Mutschler* court's failure to pay more heed to the possibility of a functional analysis is understandable, it does lead this court to find the more recent opinions cited by the defendants, which were written in light of the changes wrought by deregulation, more persuasive in reaching a decision in this case.[5]

The same can be said of *State Chartered Banks in Washington v. Peoples Nat'l Bank of Washington*, 291 F.Supp. 180 (W.D.Wash.1966), another case cited by the plaintiffs in which state law was used to determine if a branch was authorized. The court did not consider a functional approach, which is not surprising given that the decision was written in 1966. In rejecting the bank's argument for branching, the *Peoples* court relied on the condition in § 36(c)(1) that branches be "expressly" authorized by state law. *Id.* at 198–98. This term is not present in § 36(c)(2), the subsection at issue here. Moreover, it is not entirely evident from the opinion why the

---

2. Pub.L. No. 96–221, 94 Stat. 132.

3. Pub.L. No. 97–320, 96 Stat. 1469.

4. *See generally* Broome, "The Influence of Enhanced Thrift Institution Powers on Commercial Bank Market Expansion," 67 N.C.L.R. 795 (1989) (discussing effect of deregulation on thrift industry).

5. This court also confesses to some difficulty in following the logic of Part III of the *Mutschler* opinion. 607 F.2d at 279. Part III apparently begins with the supposition that state law should govern the definition of state bank. The

*Mutschler* court quotes and agrees with the district court's conclusion that Peoples National Bank does not constitute a mutual savings bank under Washington law. However, the court then continues by saying, without any apparent reason, that a Washington mutual savings bank is not a state bank as defined in the McFadden Act. Since Peoples was just held not to be a mutual savings bank, it seems unnecessary to interject that mutual savings banks are not state banks. This statement is hard to understand given its context and the lack of discussion.

use of the word "expressly" in § 36(c)(1) necessitated the conclusion that all of the state law provisions needed to be satisfied.

The plaintiffs also rely on *Dakota Nat'l Bank & Trust Co. v. First Nat'l Bank & Trust Co. of Fargo,* 554 F.2d 345 (8th Cir. 1977), *cert. denied,* 434 U.S. 877, 98 S.Ct. 229, 54 L.Ed.2d 157 (1977). In *Dakota,* the Eighth Circuit ruled that a national bank would not be allowed to branch under the McFadden Act to the same extent as could a bank owned and operated by the state of North Dakota. The court found that to allow a national bank to branch in ways available to the sovereign but not to privately-owned state banks would violate the McFadden Act policy of competitive equality between state and national banking institutions. 554 F.2d at 356. Since in this case there is no question of state-owned banks, the *Dakota* ruling is not particularly valuable in our analysis. Indeed, *Dakota* was distinguished on just that basis in the recent Eighth Circuit opinion in *Independent Bankers,* a case more factually similar to the present case as it involved applications by national banks to branch to the same extent as could state savings and loans. The Eighth Circuit upheld the Comptroller's approval of the applications, adopting the functional "business of banking" test in *Independent Bankers.*

The weight of authority thus appears to favor the functional approach adopted by the Comptroller, rather than limiting the definition of "state banks" according to state law. As the Supreme Court noted in *Plant City:*

> Admittedly, state law comes into play in deciding how, where, and when branch banks may be operated ... for in § 36(c) Congress entrusted to the States the regulation of branching as Congress then conceived it. But to allow the States to define the content of the term "branch" would make them the sole judges of their own powers. Congress did not intend such an improbable result, as appears from the inclusion in § 36 of a general definition of "branch."

*Plant City,* 396 U.S. at 133–34, 90 S.Ct. at 343.

As with the term "branch," so the inclusion of a federal definition of "state bank" in § 36 indicates an intent that the states not be the final arbiters on the issue of which financial institutions may be considered state banks. As the defendants argued, to allow states to define the term "state bank" would essentially render § 36(h) superfluous. If the reliance upon state law which is called for in § 36(c) were to encompass the use of state law definitions of "state bank," there would have been no need for the definition in § 36(h). The plaintiffs would distinguish *Plant City* with its reliance on federal law because that case interpreted a section of the McFadden Act, § 36(f), which does not make reference to state law, whereas the definition of "state bank" in § 36(h) does. However, the Comptroller did not disregard the reference to state law in § 36(h). To the contrary, the Comptroller referred to Indiana law in determining that state building and loans are authorized to carry on the "banking business."

The plaintiffs also cite two cases from this circuit, *State Bank of Rensselaer v. Heimann,* 619 F.2d 679 (7th Cir.1980), and *First Union Bank and Trust Company of Winamac v. Heimann,* 600 F.2d 91 (7th Cir.1979), *cert. denied,* 444 U.S. 950, 100 S.Ct. 423, 62 L.Ed.2d 320 (1979), for the proposition that policy-making with regard to branch banking is to be left to the states and not to the Comptroller. However, both of those cases involved the proper interpretation of "town," a term of Indiana law. Unlike the concept of "state bank," there is no definition of "town" in the McFadden Act. These cases thus do not provide guidance on the present issue, whether state or federal law should be used in defining what constitutes a state bank.

Moreover, while dicta in *Rensselaer* and *Winamac* did indicate that policy-making on branching should be left to the states, there are of course limits on the state's authority, as the Supreme Court indicated in *Plant City,* 396 U.S. at 133–34, 90 S.Ct. at 343. Incidentally, the court notes that Indiana's policy on the separation of banks and building and loans and their respective

branching abilities is not crystal clear. While the plaintiffs emphasize that banks and building and loans are distinct institutions under Indiana law, the path between the two may not be very long. As CBA indicated in its brief, the Indiana legislature has enacted:

> House Enrolled Act No. 1439, an act which permits building and loan associations to convert their charter to that of a state commercial bank. Act 1439, Section 2. This statute was enacted, in part, to permit Indiana building and loan associations to escape the restrictions of FIR-REA and obtain the powers and privileges of a state commercial bank, should the entity choose to do so. H.B. 1439, Sections 11 and 13.

Brief in Support of Plaintiff's Motion for Preliminary Injunction, p. 36.

These comments on Indiana policy aside, the court's task is to review the Comptroller's decision and, as noted at the beginning of this discussion, uphold it if it is a reasonable interpretation of the McFadden Act.

The plaintiffs also argue that federal policy, or more specifically the doctrine of competitive equality contained in the McFadden Act, requires a rejection of INB's application. As the Supreme Court stated, "It appears clear from ... the legislative history of § 36(c)(1) and (2) that Congress intended to place national and state banks on a basis of 'competitive equality' insofar as branch banking was concerned." *Logan*, 385 U.S. at 261, 87 S.Ct. at 497. This policy looks at competitive, not actual or numerical, equality under federal law between state and national institutions. The plaintiffs argue that to allow INB to branch to the same extent as do state building and loans would disadvantage state commercial banks. To the extent, if any, that this argument is offered as one of policy, it should be addressed to the appropriate legislature. To the extent that it is offered as a guide to understanding the definition of "state bank" in the McFadden Act, it is of no help.

The whole point of this dispute is to determine which institutions fit within the definition of "state bank." If the plaintiffs are correct that only those institutions meeting the state law definition of "state bank" qualify, then the doctrine of competitive equality does indeed favor their position. If, however, the defendants are correct in arguing that building and loan associations fit within the definition, then the doctrine supports their position. Thus, the competitive equality argument suggests no reason to this court for overturning the ruling of the Comptroller.

The plaintiffs also advance the argument that the legislative history of the McFadden Act shows that it was only concerned with competitive equality between national and state members of the Federal Reserve System. Since building and loan associations were not members of the Federal Reserve System and were not even considered in the debates about the McFadden Act, the plaintiffs argue that Congress did not mean for them to be included in the statutory definition of "state bank."

Initially, the court notes that it agrees with the plaintiffs that there is some ambiguity in the phrase "other such corporations or institutions carrying on the banking business under the authority of State laws" in § 36(h). The functional reading of the statute taken by the Comptroller is one (and possibly the most) plausible reading of this language. However, the court cannot by the language of the statute rule out others, such as that the other institutions must actually qualify as banks under state law (a less obvious reading, perhaps, but not one that can be disregarded simply by reading the definition in § 36(h)). Ambiguity arises in determining the scope of the terms "other such" institutions and also in determining the extent of the authorization under state law which is required.

Although reference to the legislative history of the McFadden Act thus seems appropriate, it does not provide a reason for rejecting the functional approach. CBA argues that the legislative history of the McFadden Act shows that Congress was only concerned about competitive balance between members of the Federal Reserve System, out of a fear that national banks,

which were supposedly disadvantaged vis-a-vis the state banks because of the national banks' inability to branch, would convert to state charters and thus acquire the option of leaving the Federal Reserve System. (National banks have mandatory membership.) The plaintiffs' proof on this point is made difficult by the fact that the language of § 36 includes no qualification as to membership in the Federal Reserve System. Moreover, as INB argued, the Supreme Court noted with regard to the enactment of the McFadden Act, "To us it appears beyond question that the Congress was continuing its policy of equalization first adopted in the National Bank Act of 1864." *Logan,* 385 U.S. at 261, 87 S.Ct. at 497 (citations omitted). The competitive equality policy was thus established long before the Federal Reserve System was in 1913, making it highly unlikely that the competitive equality policy was intended to only reach potential members of the Federal Reserve System.

While it does appear that many members of Congress were interested in increasing the desirability of a national bank charter in order to protect the Federal Reserve System, that was not uniformly the case, as the following portion of the House debate indicates:

> Mr. MacGREGOR. I am moved ... to inquire if the very purpose of this legislation is not to protect what the Democratic Party claims as its great project, the Federal reserve system?
>
> Mr. STEAGALL. No, I do not think so; and I do not think the Federal reserve system is in any danger on the score of branch banking.

66 Cong.Rec. H1630–31 (January 10, 1925). Even assuming that Representative Steagall was wrong and that this bill was intended to shore up the Federal Reserve System, that does not preclude a finding that another motivation behind this legislation was to protect national banks as an intrinsically worthwhile goal. Representative Williams of Michigan made the following remarks:

> It was because of needs arising out of the Civil War that the national bank act

was passed in 1863. The fundamental features of that act are well based. The banks organized under it have performed a great service and have carried the strength of the system and its efficient administration into many sections of the country where the same degree of stability could not be afforded under local laws. National banks are given the bank-note circulation privilege, which is a large factor in supplying the money needs of the country. They are the backbone of the Federal reserve system, which has proven itself a most valuable asset in our national life. Methods of examination under the national law and banking practices denied or authorized by the Comptroller of the Currency have served as salutary precedents for the banking departments of the States.

*Id.* at 1631.

These remarks indicate that the desire to protect the national bank system was a goal seen at least by some as worthwhile in and of itself, not simply because this in turn would protect the Federal Reserve System. Not only were national banks "the backbone of the Federal reserve system," but they performed other functions as well. That the legislative history is devoid of reference to savings or building and loans is not dispositive; as noted above, these institutions were not competitors with national banks to the extent they are today. The court's reading of the legislative history thus indicates that although the protection of the Federal Reserve System was one factor that motivated Congress, another partially overlapping but nonetheless independent goal appears to have been simply to strengthen national banks. This reading of the legislative history, besides illustrating the difficulty of determining "the intent" of a large group of individuals, also suggests that the definition of "state bank" was not necessarily limited to the members of the Federal Reserve System.

Likewise, the court does not find the second legislative history argument raised by the plaintiffs to merit a rejection of the Comptroller's functional approach. The

plaintiffs argue that the same definition of "state bank" was used in both sections one and seven of the McFadden Act (section one allowing banks to consolidate with banks having a national charter and section seven detailing the branching provisions at issue here), thus requiring the same interpretation to be given to each. According to the plaintiffs' argument, section one could only refer to banks having capital stock, thus excluding mutual building and loan associations from the definition of "state bank" in section one. Following the plaintiffs' argument, therefore, the definition of "state bank" in section seven (12 U.S.C. § 36(h)) cannot include building and loan associations.

While there is some appeal in this argument, it is not necessarily true that Congress intended the same interpretation of the two uses of "state bank" when two different items (consolidation and branching) were at issue. As CBA wrote in its brief with regard to the drafting of the McFadden Act, "[T]he Senate committee [on Banking and Currency] coined the definition of 'State bank' with which we are now concerned, and inserted them [sic] at the end of both sections." Brief in Support of Plaintiff's Motion for Preliminary Injunction, p. 28. It seems likely that the drafting of definitions was not a controversial, and thus not a highly deliberated, process. It is thus not surprising that CBA cites no support from the legislative history (or elsewhere) for its conclusion that "[a]s both definitions were identical, and were drafted and inserted by the same committee at the same time, they must be given identical interpretations." *Id.* In the absence of legislative history, the court is only able to speculate as to the reason (if any other than convenience) that the definition was used twice. Such speculation will not serve to show that the Comptroller's interpretation of the definition of "state bank" was unreasonable.

One last argument made by the plaintiffs against the use of the "business of banking" test merits attention. The plaintiffs argue that the fact that things change, here meaning that savings and loans now engage in many functions previously re-

served to banks, does not warrant a broadened reading of a law by the courts. For this, they cite *Chemehuevi Tribe of Indians v. Federal Power Comm'n,* 420 U.S. 395, 95 S.Ct. 1066, 43 L.Ed.2d 279 (1975). In *Chemehuevi,* the Supreme Court ruled that the Federal Power Commission's licensing jurisdiction under the Federal Power Act, 16 U.S.C. § 791a et seq., extended only to hydroelectric power plants, rejecting an argument that this jurisdiction should be extended to cover thermal-electric power plants. *Chemehuevi* is factually distinguishable from the present case. In *Chemehuevi,* the Supreme Court found that Congress' failure to mention thermal-electric plants in the Federal Power Act, "despite the fact that in 1920, as today, thermal-electric generating plants produced the greatest portion of this Nation's electric energy," 420 U.S. at 404–05, 95 S.Ct. at 1073 (footnote omitted), was indicative of a limited purpose for this legislation. Turning to the financial institutions which are at issue here, although there were no doubt some similarities between thrift institutions and commercial banks in 1927, none of the parties contends that those similarities are as great as the ones which exist today. Thus, the failure of Congress to make specific reference to savings and loans in the McFadden Act is not as telling as it was with regard to thermal-electric plants and the Federal Power Act. The Supreme Court's decision in *Chemehuevi* was also based in part on deference to the limited interpretation given to the Federal Power Act by the Federal Power Commission, 420 U.S. at 408–10, 95 S.Ct. at 1074–75, whereas such deference here supports the interpretation of the McFadden Act sought by the defendants. In light of these distinctions as well as differences in language and legislative history, the restrictive approach in *Chemehuevi* is not warranted here.

■  Even if the functional approach is adopted, the plaintiffs contend that the Comptroller's decision is erroneous in light of the recent enactment of the Financial Institutions Reform and Recovery Act, Pub.L. No. 101–73, 103 Stat. 183 (1989) ("FIRREA"). The plaintiffs' argument is

that although deregulation early in the 1980s may have increased the functional similarity of savings or building and loans and banks, in 1989, FIRREA served to re-establish the distinction between these institutions.[6] To a certain extent, this argument is true, as FIRREA does restrict a thrift's ability to perform one of the main banking functions.

■ There are three functions considered by the courts to constitute the core of the banking business: accepting deposits, lending, and cashing checks. *Deposit Guaranty*, 809 F.2d at 268 (interpreting the National Bank Act, 12 U.S.C. § 24 (Seventh)), *Volunteer*, 684 F.Supp. at 966. Of these three functions, FIRREA only restricts a thrift's lending ability. FIRREA mandates an increase in those thrift portfolio assets which must be held as "qualified thrift investments" (including investments related to real estate, housing and mortgages). FIRREA, § 303(a). Despite this increased restriction, thirty percent of a thrift's assets may still be devoted to consumer loans. FIRREA, § 301, to be codified at 12 U.S.C. § 1464(c)(2)(D). These partial restrictions on only one of three core functions which were wrought by FIRREA are not so substantial in nature as to preclude a finding that building and loans or other thrifts engage in the business of banking. *See Independent Bankers* (reaching same conclusion).

■ With regard to the application of the business of banking test, the Comptroller made additional findings that Indiana building and loan associations are authorized under Indiana law to perform several traditional banking functions. These include, among others: issuing and selling checks, drafts, money orders and letters of credit, IC 28–1–21–2(i); installing and renting safe deposit boxes, IC 28–1–21–2(k); offering negotiable order of withdrawal accounts with interest or dividends, IC 28–1–21–2(r); and making loans for personal, family or household purposes, IC 28–1–21–

23(m). The Comptroller further found that Indiana building and loans actually do engage in the banking business, based on various materials submitted to the Comptroller which indicate that Indiana building and loans offer:

> Individual Retirement Accounts, Keogh accounts, home equity and traditional residential mortgage loans, certificates of deposit, savings certificates, annuities ..., money orders, safe deposit boxes, credit cards and trust services. Moreover, at least one of the building and loan associations has actively marketed its services as "banking" and has taken advantage of the Indiana statute which allows building and loan associations to call themselves "savings banks."

Decision of the Comptroller of the Currency on the Application of Indiana National Bank of Indianapolis, Marion County, Indiana, to Establish a Branch in Bloomington, Monroe County, Indiana, March 16, 1990, pages 25–26.

These findings by the Comptroller that Indiana building and loans are statutorily authorized to and actually do perform the banking business were unchallenged by the plaintiffs and thus will not be disturbed by this court.

■ The plaintiffs advance one last argument, that INB should satisfy all of Indiana's requirements for existence as a building and loan association if it is to be allowed to branch as one. However, for this they cite the decisions in *Mutschler* and *Peoples*, which this court has declined to follow. *See supra* pp. 1523–24. Furthermore, there does not appear to be any reason to reach the issue of whether INB complies with the Indiana definition of "building and loan association." The Comptroller reasonably determined that since Indiana building and loans function as banks, they are within the definition of "state bank" contained in § 36(h) of the McFadden Act. Therefore, under § 36(c), INB may avail itself of those branching

---

**6.** The plaintiffs argue that the different federal statutory schemes for thrifts and banks show that Congress recognizes a difference in these institutions, only strengthened with the enactment of FIRREA. While there are some differences between these institutions, the "business of banking" test looks more narrowly at comparisons in the way these institutions function.

provisions allowed to Indiana building and loans under Indiana law. What the plaintiffs seek to do is to require the Comptroller to run applicants through an additional definition hurdle that cannot reasonably be found within the language of the McFadden Act. Especially since the plaintiffs cannot provide persuasive authority to support their argument, the court declines to reverse the Comptroller's approval of INB's application for failing to meet the additional requirements that the plaintiffs would have us impose.

### III. Conclusion

For the above reasons, the court finds the Comptroller's approval of INB's application to establish a branch in Monroe County to be based upon a reasonable interpretation of the McFadden Act. The court agrees with the Comptroller that Indiana building and loans perform banking functions, and that they do so under the authority of state law. Accordingly, the defendants' motions for summary judgment are granted.

It is so ORDERED.