809 F.2d 266
 55 USLW 2441
 The DEPARTMENT OF BANKING AND CONSUMER FINANCE OF the STATE
OF MISSISSIPPI, et al., Plaintiffs-Appellees,
v.
Robert L. CLARKE, Comptroller of the Currency of the United
States and Deposit Guaranty National Bank,
Defendants-Appellants.
 No. 85-4722.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 9, 1987.
 
 Anthony J. Steinmeyer, Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., Dan M. McDaniel, Jr., Asst. U.S. Atty., John F. Daly, Jackson, Miss., for Controller of Currency.
 Luther T. Munford, Lawrence J. Franck, Jackson, Miss., for Deposit Guar. Bank.
 Hubbard T. Saunders, Stephen J. Kirchmayr, Jr., Robert M. Arentson, Jr., Champ Terney, Jackson, Miss., for Dept. of Banking.
 G.E. Estes, Jr., Gulfport, Miss., for Merchants Bank.
 John M. Harral, Knox White, Gulfport, Miss., for Hancock Bank, et al.
 W. Joel Blass, Gulfport, Miss., for Gulf Nat'l. Bank.
 Appeal from the United States District Court for the Southern District of Mississippi.
 Before POLITZ, RANDALL, and JOLLY, Circuit Judges.
 POLITZ, Circuit Judge:
 
 
 1
 This appeal by the Comptroller of the Currency of the United States and Deposit Guaranty National Bank of Jackson, Mississippi, from a judgment enjoining the Comptroller and Deposit Guaranty from establishing a branch office in Gulfport, Mississippi, poses a sole question: did the Comptroller err in his interpretation of the term "State bank" as found in 12 U.S.C. Sec. 36(h), when he granted approval of Deposit Guaranty's application to establish the branch? The district court concluded that the Comptroller had erred, 617 F.Supp. 566. We disagree and reverse.
 
 Background
 
 2
 In September 1984 Deposit Guaranty, a national banking corporation chartered under the laws of the United States with its principal office in Jackson, Mississippi, applied to the Comptroller for permission to open a branch bank in Gulfport, Mississippi. Gulfport is more than 100 miles distant from Jackson. During the public comment period following the publication of notice of Deposit Guaranty's application, the Department of Banking and Consumer Finance of the State of Mississippi and several state-chartered commercial banks with offices in or near Gulfport protested. On July 9, 1985, the Comptroller rejected the protests and granted the requested approval. The Department of Banking promptly filed the instant action, seeking to enjoin the opening of the Gulfport branch. Several state commercial banks were allowed to intervene. After reviewing the record developed before the Comptroller, the district court granted the injunctive relief. Both the Comptroller and Deposit Guaranty timely appealed.
 
 
 3
 Like most states, the State of Mississippi has historically recognized and chartered two kinds of financial institutions, commercial banks and savings associations. The commercial banks are chartered under Miss.Code Ann. Sec. 81-3-3 and are regulated by the Department of Banking. The savings associations are chartered under Miss.Code Ann. Secs. 81-12-25 to 81-12-43 and are under the authority of the Mississippi Department of Savings Associations, Miss.Code Ann. Sec. 81-12-11. Originally the financial activities of the two institutions differed. In recent years, however, because of changes in state and federal law, the savings associations have become highly competitive with the state banks and other financial institutions, including national banks.
 
 
 4
 The traditional powers and functions of a bank, constituting the business of banking, are enumerated in the National Bank Act, 12 U.S.C. Sec. 24 (seventh):
 
 
 5
 (1) the discounting and negotiating of promissory notes, drafts, bills of exchange, and other evidence of debt;
 
 
 6
 (2) the receiving of deposits;
 
 
 7
 (3) the buying and selling of exchange, coin and bullion;
 
 
 8
 (4) the loaning of money on personal security; and
 
 
 9
 (5) the issuing and circulating of notes under the National Bank Act.
 
 
 10
 As is noted by the Comptroller and generally acknowledged, items (3) and (5) are of little relevance. Hence, the banking business, reduced to essentials, involves receiving deposits, making commercial loans, and negotiating checks and drafts.
 
 
 11
 Starting in 1980, Mississippi's statutes and regulations dramatically changed, conferring traditional banking powers upon Mississippi savings associations which are now authorized to: offer negotiable order of withdrawal (NOW) accounts and interest-bearing checking accounts, Miss.Code Ann. Secs. 81-12-149, 81-12-151; receive and pay interest on savings deposits and other accounts, Miss.Code Ann. Sec. 81-12-49(d); lend and invest funds, Miss.Code Ann. Secs. 81-12-49(p), 81-12-155, 81-12-159; service loans and investments, Miss.Code Ann. Sec. 81-12-49(n); and sell money orders and travelers' checks, Miss.Code Ann. Sec. 81-12-49(l). Under what is sometimes referred to as the "wild card" statute, Miss.Code Ann. Sec. 81-12-49(r), Mississippi savings associations may engage in any activity permitted a federally chartered savings and loan association in that state. And, of some significance, savings associations may now use the appellation "savings bank," contrary to the former law reserving the title "bank" for commercial banking institutions. Miss.Code Ann. Sec. 81-3-3; Miss. Savings Rule 16.1.
 
 
 12
 Consistent with the previous sharp separation of functions, banks and savings associations were accorded different treatment. One difference central to the case at bar involves branch units. A savings association may open branches throughout the state, Miss.Code Ann. Sec. 81-12-175, whereas the state commercial banks, since the 1986 amendments, are allowed to open branches only in the county in which the bank's principal office is located, or within a 100-mile radius, Miss.Code Ann. Sec. 81-7-7.
 
 
 13
 The Comptroller is responsible for the supervision of 5,000 national banks chartered under federal law. Congress has empowered the Comptroller to make definitive judgments on the application of national banks for permission to relocate or to open branches, 12 U.S.C. Secs. 30, 36. The federal branching provision, commonly referred to as the McFadden Act, permits a national bank to open branches anywhere that a state bank may. The National Bank Act, 12 U.S.C. Sec. 36, provides in pertinent part:
 
 
 14
 (c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches ... at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.
 
 
 15
 * * *
 
 
 16
 * * *
 
 
 17
 (h) The words "State bank," "State banks," "bank," or "banks," as used in this section, shall be held to include trust companies, savings banks, or other such corporations or institutions carrying on the banking business under the authority of State laws.
 
 
 18
 In his consideration of the application of Deposit Guaranty for permission to open a Gulfport branch, the Comptroller received in evidence a study of the banking industry in Mississippi reflecting that savings associations offered traditional banking services such as, inter alia, interest-bearing checking accounts, commercial checking accounts, consumer loans, business and construction loans, savings deposits, and related incidental services. After considering the evidence presented, applicable federal and state statutes and regulations, and the relevant jurisprudence, the Comptroller determined that savings associations in Mississippi were engaged in the business of banking and were "State banks" within the meaning of 12 U.S.C. Sec. 36(h). The Comptroller accordingly concluded that "[n]ational banks in Mississippi may, thus, branch to the same extent as Mississippi savings associations, i.e., statewide." We are charged to uphold the Comptroller's determination if we find it to be a "permissible construction" of the National Bank Act. See Chevron v. Natural Resources Defense Council, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984); Texas v. United States, 756 F.2d 419 (5th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 129, 88 L.Ed.2d 106 (1985). In reaching his conclusion the Comptroller applied a federal definition of banking, eschewed state-applied labels, and looked primarily to the function of the institutions.
 
 Analysis
 
 19
 The threshold issue we confront is whether the Comptroller, in his interpretation and application of a federal statute, in this case 12 U.S.C. Sec. 36(h), should look to state or federal law to define the statute's terms. We conclude and hold that in his interpretation of 12 U.S.C. Sec. 36(c) and (h) the Comptroller may seek the guidance of helpful state law, but is bound to follow federal law in defining terms contained in the federal statute. This includes, of course, the terms "State bank" and "banking business."
 
 
 20
 The Supreme Court's reasoning in First National Bank of Logan v. Walker Bank and Trust Co., 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966), illuminates our path. The Court there held that national banks in Utah were constrained to establish branches in the same manner as state banks in that state. The Court opined that "[i]t appears clear from ... the legislative history of Sec. 36(c)(1) and (2) that Congress intended to place national and state banks on a basis of 'competitive equality' insofar as branch banking was concerned." 385 U.S. at 261, 87 S.Ct. at 497. It was this concern for competitive equality that drove the Court's decision in First National Bank in Plant City v. Dickinson, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969), wherein it held that the definition of "branch" in 12 U.S.C. Sec. 36 was a matter of federal law.
 
 
 21
 In Plant City, the Court emphasized the importance of employing a federal definition to ensure that national banks would be able to perform the same branching functions as neighboring state banks. The Court relied on the legislative history of the McFadden Act, codified as 12 U.S.C. Sec. 36, reasoning that to allow the states to regulate banking functions "would make them the sole judges of their own powers. Congress did not intend such an improbable result...." 396 U.S. at 133-34, 90 S.Ct. at 343. The court cited legislative history demonstrating that Congress was concerned that "neither system have advantages over the other in the use of branch banking" and that national banks would be protected "from the unrestricted branch bank competition of state banks." Id. at 131, 90 S.Ct. at 342.[1]
 
 
 22
 The principle of competitive equality guided the Comptroller's analysis and informed his decision in the present case. He observed that "the concept of competitive equality requires a federal definition of 'State bank' to prevent states from disadvantaging national banks vis-a-vis state-chartered institutions by merely denominating these institutions 'banks' and treating them somewhat differently from state commercial banks, though not so differently as to prevent these institutions from competing with national banks."
 
 
 23
 We conclude that the Comptroller's use of federal law and the competitive equality standard was legally correct. By doing so the Comptroller was faithful to the congressional mandate and demonstrated considerable expertise in balancing national and state interests in this constantly evolving area.
 
 Function versus Title
 
 24
 Having concluded that the federal definition of banking business controls the meaning of that term in Sec. 36(h), we must now determine whether the Comptroller correctly placed the Mississippi savings associations within that subsection. The Comptroller looked to function and found as a fact that the savings associations were engaged in the banking business. The district court did not address those factual findings.
 
 
 25
 We agree with the Comptroller that the language of Sec. 36(h) expressly requires a consideration of function. The statute directs that the term "State bank," as used therein, "shall be held to include ... corporations or institutions carrying on the banking business under the authority of state laws." We hold that the Comptroller was statutorily mandated to determine whether the Mississippi savings associations, some of which publicly refer to themselves as "savings banks," were actually "carrying on the banking business." This task could only be accomplished by a targeted functional analysis.[2] The very recent Supreme Court decision in Clarke v. Securities Industry Association, --- U.S. ----, 107 S.Ct. 750, --- L.Ed.2d ---- 1987), implicitly supports the Comptroller's use of this functional analysis methodology.
 
 
 26
 As noted above, Congress has defined the business of banking, stripped to its essentials, as accepting deposits, paying checks, and making loans. As observed by the Comptroller, these three primary functions are listed in the National Bank Act's definition of branch in 12 U.S.C. Sec. 36(f).[3]
 
 
 27
 As a reviewing court, we must accept the Comptroller's factual findings unless we find that they are arbitrary or capricious. 5 U.S.C. Sec. 706. Our determination must be made on the basis of the administrative record. Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).
 
 
 28
 The Comptroller's factual determination that the savings associations are engaged in the banking business is amply supported by the record. These associations, consistent with state law, accept deposits, pay interest on accounts, offer checking accounts, act in a fiduciary capacity, make personal loans, sell money orders and travelers' checks, service loans, manage investments, honor withdrawals from savings accounts, and purchase, sell, lease, and mortgage both personal and real properties. This factual finding by the Comptroller is neither arbitrary nor capricious. It is patently correct.
 
 
 29
 In reaching our conclusion we are not unmindful of the Garn-St. Germain Act, adopted in 1982, 12 U.S.C. Sec. 1461 et seq., expanding the regulatory scheme for savings and loan associations. That regulatory scheme, intended to ensure that savings and loan institutions maintain their status "as the nation's primary home lender," S.Rep. No. 641, 97th Cong.2d Sess. 88, reprinted in 1982 U.S. Code Cong. & Ad. News 3054, 3131, differs from the regulation of the traditional bank. The principal difference involves the limits placed on the commercial and consumer loans and investments of the savings institutions, designed to protect their capacity to make needed home loans. That legislation neither proscribes the functional analysis made by the Comptroller nor militates against his interpretation of 12 U.S.C. Sec. 36(h).
 
 
 30
 The Comptroller did not incorrectly interpret the controlling statutory provisions. His interpretation was more than a mere "permissible construction," all that is required in order to secure this court's deference. See Chevron v. Natural Resources Defense Council; United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); and Texas v. United States. We find the Comptroller's interpretation to be amply supported by the express "language employed by Congress," giving the words it chose their "ordinary meaning." American Tobacco Co. v. Patterson, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982).
 
 
 31
 The district court erred in enjoining the Comptroller and Deposit Guaranty. The injunction imposed is vacated and the judgment is reversed. The Comptroller is entitled to judgment as a matter of law. The matter is returned to the district court for entry of an appropriate judgment.
 
 
 32
 REVERSED.
 
 
 
 [1]
 In other areas traditionally regulated by state law, the Supreme Court has applied federal definitions to federal statutory terms even when the federal statute contains references to state law provisions. See Chase Manhattan Bank v. City Finance Admin., 440 U.S. 447, 99 S.Ct. 1201, 59 L.Ed.2d 445 (1979) (definition of "tax" under federal statute governing state taxation is a question of federal law); SEC v. Variable Annuity Life Insurance Co., 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959) (definitions of "insurance" and "annuities" for purposes of federal regulation are questions of federal law even if such definitions work to displace or hinder state regulation)
 
 
 [2]
 Our colleagues in the District of Columbia Circuit used this approach in defining "branch" in Independent Bankers Association of America v. Smith, 534 F.2d 921 (D.C.Cir.), cert. denied, 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 141 (1976). There, the court determined that all bank offices, state or national, that perform any one of three branch banking services, are "branches" for purposes of the National Bank Act, regardless of the offices' actual labels. Thus, for example, automatic teller machines constitute "branches" for purposes of the Act
 
 
 [3]
 The Supreme Court has defined "banking business" similarly in antitrust cases. In United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), the Court stated that of the various banking services and products,
 the creation of additional money and credit, the management of the checking account system, and the furnishing of short-term business loans would appear to be the most important.
 374 U.S. at 326-27, 83 S.Ct. at 1721. The Court has repeated this delineation of banking functions in subsequent antitrust cases, see, e.g., United States v. Phillipsburg National Bank, 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970); United States v. First National Bank, 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964).