INDEPENDENT BANKERS ASSOCIATION OF AMERICA, Missouri Independent Bankers Association and the Callaway Bank, Plaintiffs,

v.

Robert L. CLARKE, Comptroller of the Currency of the United States and First National Bank & Trust Company, Columbia, Missouri, Defendants.

STATE OF MISSOURI, ex rel., Thomas B. FITZSIMMONS, Commissioner of Finance, Plaintiff,

v.

Robert L. CLARKE, Comptroller of the Currency of the United States and First National Bank & Trust Company, Columbia, Missouri, Defendants.

Nos. 89–4027–CV–C–9, 89–4029–CV–C–9.

United States District Court,
W.D. Missouri, C.D.

June 30, 1989.

Leonard J. Rubin, Marc S. Palay, Brian P. Maschler, Jones, Day, Reavis & Pogue, Washington, D.C., for Bruce H. Beckett.

Robert R. Raymond, John M. Kilroy, Jr., Shugart, Thomson & Kilroy, Kansas City, Mo., for Vaughan Finn.

Michael Boicourt, Attorney General's Office, Jefferson City, Mo., for Bruce H. Beckett.

Irven L. Friedhoff, Jefferson City, Mo., for Francis Reddis, AUSA.

## MEMORANDUM OPINION RULING SOME ISSUES AGAINST PLAINTIFFS AND IN FAVOR OF DEFENDANTS AND REQUESTING ADDITIONAL BRIEFING ON ONE ISSUE

BARTLETT, District Judge.

On July 1, 1987, defendant First National Bank & Trust Company ("FNB") filed with the Comptroller of the Currency of the United States ("Comptroller") an application to establish a domestic branch office in a Jefferson City supermarket. FNB filed a similar application on July 8, 1987, to open a second domestic branch office in a Fulton, Missouri, grocery store. Both proposed branch offices would be located outside FNB's county. The Commissioner of Finance of the State of Missouri, who is charged with execution of the laws related to banks, trust companies and the conduct of banking business in Missouri pursuant to Mo.Rev.Stat. § 361.020, filed comments in opposition to FNB's branch applications on October 28, 1987. On January 26, 1989, the Comptroller approved FNB's applications to establish the two branch offices.

On January 27, 1989, plaintiffs Independent Bankers Association of America ("IBAA"), Missouri Independent Bankers and The Callaway Bank filed a complaint in this court challenging the Comptroller's action naming as defendants Robert L. Clarke in his capacity as Comptroller and the First National Bank & Trust Company (case No. 89–4027–CV–C–9). Also on January 27, 1989, the State of Missouri filed a complaint in case No. 89–4029–CV–C–5 for declaratory judgment and injunctive relief against Clarke as Comptroller and the First National Bank & Trust Company. Plaintiffs in both cases assert that the Comptroller's approval of FNB's branch applications was without authority and in violation of § 36(c) of the National Bank Act, 12 U.S.C. § 36. The cases were consolidated for all purposes on February 28, 1989.

Although plaintiffs originally sought a preliminary injunction enjoining FNB from opening the branches in issue, FNB agreed not to open the branches pending resolution of plaintiffs' request for a permanent injunction if the case would be processed in an expedited manner. Plaintiffs and defendants have filed cross-motions for summary judgment discussing whether 1) FNB should be enjoined from opening the branches at issue; and 2) the Comptroller should be enjoined from using his functional definition of "State bank" in applying 12 U.S.C. § 36(h). A hearing was held on March 23, 1989, on the parties' motions.

### I. *Background*

#### A. National Banks

Congress has established a system of national banks to perform such functions as "providing circulating medium and government credit, as well as financing commerce and acting as private depositaries." *Franklin National Bank v. New York,* 347 U.S. 373, 375, 74 S.Ct. 550, 552, 98 L.Ed. 767 (1954). Supervision of banks chartered under federal law is the responsibility of the Comptroller, who is the chief administrator of the Office of the Comptroller of the Currency. The Comptroller's Office is a bureau of the United States Department of the Treasury and is charged with the enforcement of the National Bank Act, 12 U.S.C. § 1, *et seq.*

Among other duties, the Comptroller is empowered under 12 U.S.C. §§ 30, 36 to accept or reject applications of national banks to establish branches or relocate their main offices. The McFadden Act, 12 U.S.C. § 24, *et seq.*, permits national banks to establish branches wherever "State banks" may do so, 12 U.S.C. § 36(c). Section 36(c) provides in pertinent part that:

A national banking association may, with the approval of the Comptroller of the

Currency, establish and operate new branches ... at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to locations imposed by the law of the State on State banks.

12 U.S.C. § 36(c).

The term "State banks" as used in § 36(c) is defined in § 36(h) as follows: "The words 'State bank,' 'State banks,' 'bank,' or 'banks,' as used in this section, shall be held to include trust companies, savings banks, or other such corporations or institutions carrying on the banking business under the authority of State laws." 12 U.S.C. § 36(h).

### B. Missouri Banks and Savings and Loans

The State of Missouri regulates state commercial banks and state-chartered savings and loans.

Chapter 362 of the Revised Statutes of Missouri applies to state commercial banks. Section 362.105.1(1) states in relevant part that: "No bank or trust company shall maintain in this state a branch bank or trust company, or receive deposits or pay checks except in its own banking house or as provided in Section 362.107." Section 362.107 provides that a bank located outside of a first class county may establish a branch only in the county in which it is chartered with certain exceptions that are not relevant here.

Chapter 369 of the Revised Statutes of Missouri applies to state savings and loans. There is no geographical restriction on where a savings and loan may establish a branch. Mo.Rev.Stat. § 369.329 [1]

As plaintiffs conceded at oral argument, the business of state savings and loans differed significantly from the business of banks in Missouri. As the result of changes in state and federal law and competitive pressures, savings and loans in Missouri now compete directly with state banks and with other financial institutions, including national banks. For example, Missouri chartered savings and loans are now authorized to offer negotiable orders of withdrawal (NOW) accounts and interest bearing checking accounts, Mo.Rev.Stat. §§ 369.154, 369.189; to lend and invest funds Mo.Rev.Stat. §§ 369.144(15), 369.229; and to sell money orders and travelers' checks, Mo.Rev.Stat. § 369.144(10). Also, under what is sometimes referred to as a "wild card" statute, Missouri savings and loans are affirmatively authorized to engage in any activity permitted a federally chartered savings and loan. Mo.Rev.Stat. §§ 369.144(7), 369.299. For instance, Missouri savings and loans are permitted to offer checking accounts to businesses that have had a loan relationship with the savings association, 12 U.S.C. § 1464(b)(1); to make commercial loans of up to 10 percent of assets to commercial customers, 12 U.S.C. § 1464(c)(1)(R); and to make invest-

---

1. No association may establish or maintain a branch office or agency without the prior written approval of the director of the division of savings and loan supervision, except that temporary and incidental agencies may be created for individual transactions and for special temporary purposes without such approval. Each application for approval of the establishment and maintenance of a branch office or one or more agencies shall state the proposed location of the branch office or agency, the functions to be performed at the office or agency, the estimated volume of business at the branch office or agency, the estimated annual expense of the branch office or agency and the mode of payments for the branch officer agency on such additional matters as the director of the savings and loan supervision by regulation may require. Each such application shall be accompanied by a budget of the association for the current earnings period and for the next succeeding semi-annual period, which reflects the estimated additional expense of the maintenance of each such branch office or agency. No branch application shall be granted if, in the opinion of the director or a majority of the members of the commission on appeal, the policies, condition or operation of the applicant afford a basis for supervisory objection to the application. The director of the division of savings and loan supervision may hold a hearing at his discretion on the application in accordance with such procedures as he by regulation may require.
Mo.Rev.Stat. § 369.329

ments in tangible personal property of up to ten percent of assets for purposes of rental or sale, 12 U.S.C. § 1464(c)(2)(A).

### C. The Comptroller's Decision

In his consideration of FNB's application to open the branches at issue, the Comptroller had before him a study performed by BHN Advertising and Public Relations of Columbia, Missouri. This study analyzed whether Missouri savings and loans were in fact exercising their authority to conduct the expanded services discussed above. The report showed that Missouri savings and loans were offering many traditional banking services such as consumer loans (including automobile loans), commercial checking, commercial loans, construction loans and individual NOW accounts.

After considering the applications and supporting materials, as well as the protests submitted, the Comptroller determined that Missouri savings and loans were "State banks" as defined in 12 U.S.C. § 36(h) because they were engaged in banking business under the authority of Missouri law. He further determined that Missouri savings and loans were authorized to open branches anywhere in the State. Therefore, FNB, a national bank, could operate the new branches because a "State bank" could have opened the branches.

The parties agree that this interpretation of the McFadden Act has been used by the Comptroller in approving 30 new branches for 15 national banks in four other states: Mississippi, Louisiana, Texas, Tennessee and Florida. In each case, the Comptroller determined that state savings and loans were "State banks" under § 36(h). In each case the effect of the Comptroller's interpretation of § 36(h) has been to grant certain national banks broader branching authority than state commercial banks.

### II. Standard of Review

■ Courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 107 S.Ct. 750, 759, 93 L.Ed.2d 757 (1987). "The Comptroller of the Currency is charged with the enforcement of banking laws to an extent that warrants the invocation of this principle with respect to his deliberative conclusions as to the *meaning* of these laws." *Id.* 107 S.Ct. at 759–60 (emphasis added). *See also Department of Banking & Consumer Finance of Mississippi v. Clarke,* 809 F.2d 266, 269 (5th Cir.1987) (hereafter *"Deposit Guaranty"*) ("We are charged to uphold the Comptroller's determination if we find it to be a 'permissible construction' of the National Bank Act.").

Plaintiffs assert that the Comptroller's interpretation of "State bank" is subject to *de novo* review relying on *Dakota National Bank & Trust Co. v. First National Bank & Trust Co. of Fargo,* 554 F.2d 345, 350–51 (8th Cir.1977) which stated:

[I]n the present case we are concerned primarily with a determination of law. Questions of law such as the one in this case, which involve judicial interpretation of the statutory term "branch bank," may be reviewed *de novo* by both the district court and the appeals court. The Ninth Circuit made this distinction in regard to questions of law in *Seattle Trust & Savings Bank v. Bank of California,* 492 F.2d 48 (9th Cir.1974).

*Id.* (footnote omitted).

In light of the Supreme Court's deference to the Comptroller's interpretation of the McFadden Act in *Securities Industry,* decided ten years after the *Dakota National Bank, de novo* review of the Comptroller's interpretation of the McFadden Act appears to be inappropriate.

### III. The Comptroller's "Functional" Definition Reflects the Intent of Congress in Enacting the McFadden Act

■ The broad question presented in this case is whether the Comptroller properly concluded that Missouri savings and loans were "State banks" as defined in § 36(h) because savings and loans in Missouri are "corporations or institutions carrying on the banking business under the authority of state laws." In resolving this question, a crucial inquiry is whether Congress intended that federal courts should be bound

by what a state labeled as "banking" business in applying the definition of § 36(h).

In *First National Bank of Logan v. Walker Bank & Trust Co.*, 385 U.S. 252, 261, 87 S.Ct. 492, 497, 17 L.Ed.2d 343 (1966), the Court discussed the legislative history of the McFadden Act and concluded that:

> It appears clear from this resume of the legislative history of § 36(c)(1) and (2) that Congress intended to place national and state banks on a basis of "competitive equality" insofar as branch banking was concerned[.] Both sponsors of the applicable banking Act, Representative McFadden and Senator Glass, so characterized the legislation. It is not for us to so construe the Acts as to frustrate this clear-cut purpose so forcefully expressed by both friend and foe of the legislation at the time of its adoption. To us it appears beyond question that the Congress was continuing its policy of equalization first adopted in the National Bank Act of 1864.

*See also First National Bank in Plant City, Florida v. Dickinson*, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969) in which the Court, relying on the conclusion in *Walker*, states that "the McFadden Act was a response to the competitive tensions inherent in a dual banking structure where state and national banks coexist in the same area. That Act reflects the congressional concern that neither system have advantages over the other in the use of branch banking." *Id.* at 131, 90 S.Ct. at 342.

In the present case, however, *both* sides argue that Congress' intent in the McFadden Act to foster "competitive equality" favors their position.

Plaintiffs argue that Congress intended the McFadden Act to establish "competitive equality" between national *banks* and state *banks*. By tying the branching rights of national banks directly to the branching rights of state banks, plaintiffs argue Congress intended to remove the competitive advantage which state banks had previously enjoyed over national banks. Plaintiffs, therefore, conclude that the Comptroller's

application of a definition of "State banks," which results in national banks being able to branch in locations where state banks may not, is directly contrary to Congress' intention to bring state and national banks onto a "level playing field."

Defendants argue that Congress intended by the McFadden Act to establish "competitive equality" between national *banks* and any state chartered *financial institution that actually competes with national banks*. Defendants complain that under plaintiffs' view, the Comptroller could not allow a national bank to branch any further than those institutions that the state calls "banks," without regard to the actual activities of state financial institutions not called "banks." Defendants also argue that the very inclusion of a definition section in the federal statute (§ 36(h)) indicates that Congress intended that a court should decide what institutions are actually doing "banking business" under state law regardless of what label the state put on the institutions. Otherwise § 36(h) would be superfluous.

In *First National Bank in Plant City v. Dickinson*, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969), the Court determined that the definition of "branch" in 12 U.S.C. § 36(f) was a matter of federal law. The Court specifically rejected the National Association of Supervisors of State Banks' argument that state definitions of what constitutes "branch banking" should determine the meaning of "branch" as defined in § 36(f):

> Admittedly, state law comes into play in deciding how, where, and when branch banks may be operated, *Walker Bank*, for in § 36(c) Congress entrusted to the States the regulation of branching as Congress then conceived it. *But to allow the States to define the content of the term "branch" would make them the sole judges of their own powers. Congress did not intend such an improbable result*, as appears from the inclusion in § 36 of a general definition of "branch." On this point the language of the Court of Appeals perhaps overstated the relation of state law to the problem, since the threshold question is to be de-

termined as a matter of federal law, having in mind the congressional intent that so far as branch banking is concerned "the two ideas shall compete on equal terms and only where the States make the competition possible by [allowing] their own institutions [to] have branches." In short, the definition of "branch" in § 36(f) must not be given a restrictive meaning which frustrate[s] the congressional intent this Court found to be plain in *Walker Bank.*

396 U.S. at 133–34, 90 S.Ct. at 343 (emphasis added and footnote omitted).

In the instant case, to allow a state to define "State bank" merely by the label the state uses for its own regulatory purposes would make the state the sole judge of the branching abilities of national banks. As in *Plant City,* to allow state labels to control would frustrate Congress' intent to promote competitive equality.

In *Deposit Guaranty,* 809 F.2d 266 (5th Cir.1987), the court upheld the Comptroller's functional definitions of "State bank" and "banking business" in a case which presented the identical issue as the present case:

The principle of competitive equality guided the Comptroller's analysis and informed his decision in the present case. He observed that "the concept of competitive equality requires a federal definition of 'State bank' to prevent states from disadvantaging national banks vis-a-vis state-chartered institutions by merely denominating these institutions 'banks' and treating them somewhat differently from state commercial banks, though not so differently as to prevent these institutions from competing with national banks."

We conclude that the Comptroller's use of federal law and the competitive equality standard was legally correct. By doing so the Comptroller was faithful to the congressional mandate and demonstrated considerable expertise in balancing national and state interests in this constantly evolving area.

809 F.2d at 270.

Similarly, in *Volunteer State Bank v. National Bank of Commerce,* 684 F.Supp. 964 (M.D.Tenn.1988), the court upheld the Comptroller's federal definition of "State bank" and "banking business:"

This Court, having reviewed the legislative history of the McFadden Act and the record before the Comptroller, can say neither that his decision is unreasonable, nor that it would not be sanctioned by Congress. The statutory purpose is to keep national banks from being competitively disadvantaged. The Court takes judicial notice of the dramatic changes that have occurred in recent years in the financial industry, and in particular, of the expanded powers and competitive advertising of thrift institutions in their successful attempt to engage in the "banking business." Federally chartered savings and loans have engaged in statewide branching in Tennessee because under their "wild card" statute, they may do as state chartered savings banks may do. The ruling of the Comptroller in this case merely creates a level playing field for nationally chartered banks and further enhances competition in the financial industry.

684 F.Supp. at 967 (footnotes omitted). *See also Texas v. Clarke,* 690 F.Supp. 573 (W.D.Tex.1988) and *Barnett Bank of South Florida v. Clarke,* 712 F.Supp. 1549 (S.D.Fla.1989) which uphold the Comptroller's federal definitions of "State bank" and "banking business."

As these cases recognize, "State bank" is defined in § 36(h) in broad rather than narrow terms. Congress did not say that "State banks" are only those institutions that have the label "bank" attached to them. On the contrary, Congress stated that "State bank" as used in § 36(c) shall "include trust companies, savings banks, or *other such corporations or institutions carrying on the banking business under authority of State laws.*" Congress intended to include within the definition of "State bank" *any* corporation or institution carrying on the banking business regardless of the title a state gave the institution. Therefore, the crucial question in applying

§ 36(c) to a particular factual situation centers on the branching authority of institutions "carrying on the banking business under the authority of state laws."

Plaintiffs assert that *Dakota National Bank & Trust Co. v. First National Bank & Trust Co. of Fargo*, 554 F.2d 345 (8th Cir.1977) held that the McFadden Act prohibited the Comptroller from authorizing national banks to branch to a greater degree than state banks even though other state financial institutions had broader branching authority. *Dakota Bank* does not stand for the proposition plaintiffs assert because of its unique facts. The case involved the Bank of North Dakota, a state-owned bank, that received 75 percent of its deposits from the State of North Dakota. The Comptroller had deemed this state-owned bank to be a "State bank" under § 36(h). Then, the Comptroller had attempted to use the broad branching authority granted to this state-owned bank to grant national bank branch applications. On these facts, the court held that the Bank of North Dakota was not a "State bank" according to federal definition of "State bank" in 12 U.S.C. § 36(h).

> The definition obviously does not address the specific problem of a *state-owned* bank as a bank operating "under the authority of State laws." However, the character of the Bank of North Dakota, as interpreted by the district court and with which we agree, is that of an agency of the sovereign power. It is in effect an arm of the state of North Dakota. It would be inimical to the policy of *competitive equality* to accord privately-owned, *nationally*-chartered banks the same privileges given to the sovereign when they are denied to privately-owned, state-chartered banks. We are persuaded that competitive quality was intended to be maintained between the privately-owned banking institutions, state and federal, rather than between the national banks and the *state itself* in its banking endeavors. As such, we do not include the Bank of North Dakota within the definition or meaning of §§ 36(h) or 36(c). We express no opinion as to whether the Bank of North Dakota has

unlimited branching powers under state law.

554 F.2d at 356 (emphasis in original). Thus, *Dakota Bank* turned on the state-owned character of the Bank of North Dakota rather than on competitive equality between state and federal "privately-owned banking institutions."

In light of the legislative history of and the words used by Congress in the McFadden Act and for the reasons stated in this opinion, the Comptroller reasonably concluded that § 36(h) required that he determine what institutions within Missouri are authorized by Missouri "statute law" to carry on "the banking business." The Comptroller reasonably believed that the Congressional purpose underlying § 36(h) of assuring competitive equality between state institutions performing banking services and national banks would not be achieved if the Comptroller was bound by state labels such as which institutions the state called "banks." Accordingly, I will not disturb the Comptroller's "reasonable accommodation of conflicting policies that were committed to the agency's care by the statute...." *Chevron USA v. National Resources Defense*, 467 U.S. 837, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984).

Furthermore, even if a *de novo* review is the proper standard and *de novo* review does not permit deferring to reasonable administrative interpretations, I would reach the same result in light of the legislative history and the wording of the statute.

IV. *Limited Additional Briefing is Required to Determine Whether the Comptroller Properly Applied His Functional Definition to Missouri Savings and Loans*

■ The remaining question is whether the Comptroller properly concluded by reference to state law that Missouri savings and loans actually perform "banking business." The Comptroller's factual conclusions must be accepted unless they were arbitrary or capricious amounting to an abuse of discretion. 5 U.S.C. § 706(2)(A). Whether the factual conclusions were arbitrary or capricious must be determined

from the administrative record. *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

Essentially, banking business involves 1) the discounting and negotiating of promissory notes, drafts, bills of exchange and other evidence of debt; 2) the receiving of deposits; and 3) the loaning of money on personal security. *See* National Bank Act, 12 U.S.C. § 24 (Seventh); *Deposit Guaranty*, 809 F.2d at 268.

The Comptroller concluded that under Missouri law, Missouri savings and loans are authorized to accept deposits, offer checking accounts to individuals and certain businesses, make personal and automobile loans, sell money orders and travelers' checks, service loans, honor withdrawals from savings accounts and purchase, sell, lease and mortgage property. Furthermore, the Comptroller concluded that in fact Missouri savings and loans offer these services. The first conclusion is supported by Missouri law and the second by the factual record. *See* Administrative Record at 15–16, 69, 82–169. Accordingly, the Comptroller's January 26, 1989, determination that Missouri savings and loans are engaged in "the banking business" is neither arbitrary nor capricious.

Relying on that part of 12 U.S.C. § 36(h) which defines a "State bank" as "including *trust companies, savings banks or other such corporations or institutions* carrying on the banking business under the authority of State laws" (emphasis added), plaintiffs argue that, because savings and loans are not specifically listed, Congress intended to exclude them from the definition of "State banks."

Section 36 is "designed to ... build into the federal statute a self-executing provision to accommodate changes in state regulation." *Plant City*, 396 U.S. at 133, 90 S.Ct. at 343. Congress employed "a calculated indefiniteness with respect to the outer limits of the term [branch bank]" so that the Comptroller would be able to apply the term to changing circumstances. *See id.*, 396 U.S. at 135, 90 S.Ct. at 344. The court in *Union National* concluded, and I agree, that "section 36(h), defining 'State bank,' possesses the same calculated indefiniteness the Supreme Court found in § 36(f). The phrase 'other such institutions' was not meant to exclude nonenumerated financial institutions, but to include all those conducting banking business pursuant to state laws." *Union National*, 690 F.Supp. at 579. This reading furthers a functional, fact-sensitive approach to determining whether an institution under state law is in reality a "State bank." Thus, Congress' goal of competitive equality is implemented without the necessity of Congress having to continually amend the statute to account for changes in the financial services industry. *See id.* Therefore, the broad language used in § 36(h) includes savings and loans.

Next, plaintiffs note that 12 U.S.C. § 36(c) allows a national bank to establish a branch "at any point within the state in which said association is situated, if such establishment and operation are at the time authorized to state banks by the statute law of the State in question by language specifically granting such authority *affirmatively and not merely by implication or recognition.* ..." (Emphasis added.) Plaintiffs argue that the Missouri statute does not *affirmatively* grant savings and loans the right to branch statewide.

The Missouri statute governing branching by savings and loans reads "[n]o association may establish or maintain a branch office or agency without the prior written approval of the director of the division of savings and loan supervision. ..." Mo. Rev.Stat. § 369.329 (see complete statute in footnote 1). Similar statutes have been construed as affirmative grants of branching authority in *Deposit Guaranty*, 809 F.2d at 268 and *Texas v. Clarke*, 690 F.Supp. 573 (W.D.Tex.1988). On the basis of *Deposit Guaranty*, the Comptroller only summarily addressed this issue in his decision. *See* Administrative Record at 17–18. However, because the analysis of this issue in these cases was limited and because defendants have not adequately addressed this issue in their briefs, the parties will be directed to file supplemental briefing on this issue *only.*

Therefore, it is hereby ORDERED that:

1) within 12 days from the date of this order, defendants shall file a supplemental brief on the narrow issue of whether Missouri savings and loans are authorized to establish branches at any point in the State of Missouri "by the statute law" of Missouri "by language specifically granting such authority affirmatively and not merely by implication or recognition; ..." and

2) within 12 days from the date of defendants' filing, plaintiffs may file a supplemental response on the same issue.