**INDEPENDENT BANKERS ASSOCIA-TION OF AMERICA, Missouri Independent Bankers Association, and The Callaway Bank, Appellants,**

v.

**Robert L. CLARKE, Comptroller of the Currency of the United States, and First National Bank & Trust Co., Columbia, Missouri, Appellees.**

**STATE OF MISSOURI EX REL. Thomas B. FITZSIMMONS, Commissioner of Finance, Appellant,**

v.

**Robert L. CLARKE, Comptroller of the Currency of the United States, and First National Bank & Trust Co., Columbia, Missouri, Appellees.**

Nos. 90–1243WM, 90–1244WM.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 8, 1990.

Decided Oct. 29, 1990.

Leonard Rubin of Washington, D.C., for appellant Independent Bankers Assoc.

Michael L. Boicourt, Asst. Atty. Gen., Jefferson City, Mo. for appellant State of Mo.

Vaughan Finn of U.S. Dept. of Justice, Washington, D.C., for appellee.

Before ARNOLD and FAGG, Circuit Judges, and WATERS,[*] District Judge.

ARNOLD, Circuit Judge.

This case concerns the power of the Comptroller of the Currency to authorize national banks located in Missouri to establish branches outside their home counties. In general, the McFadden Act, 12 U.S.C. § 36, authorizes national banks to establish branches only to the extent that state banks within the same state are allowed to branch by state law. In Missouri, with exceptions not here relevant, state banks may not establish branches outside their home counties. Missouri state-chartered savings and loan associations, however, are allowed to branch without geographic restriction, and the McFadden Act, 12 U.S.C. § 36(h), provides that the words "State banks"

> shall be held to include trust companies, savings banks, or such other corporations or institutions carrying on the banking business under the authority of State laws.

The Comptroller, applying what has come to be called a "functional" definition of "State banks," takes the view that Missouri state-chartered savings and loan institutions are "carrying on the banking business under the authority of" Missouri law, as that phrase is used in the statute, and has therefore authorized a national bank in Missouri to establish branches outside its home county, notwithstanding the fact that state banks, properly so called, could not do so.

The District Court[1] upheld the Comptroller's action in a series of opinions. *Independent Bankers Association of America v. Clarke,* 716 F.Supp. 1238 (W.D.Mo.1989), *summary judgment for defendant entered,* 743 F.Supp. 687 (W.D.Mo.1989). A motion for post-judgment relief was denied, and these appeals followed. Largely for the reasons given in the District Court's well-organized and well-written opinions, we affirm.

I.

This case arises out of the efforts of the First National Bank & Trust Company of Columbia, Missouri, to establish two branches. In 1987, it applied to the Comptroller of the Currency for permission to establish branches in a supermarket in Jefferson City, Missouri, and in a grocery store in Fulton, Missouri, both outside its home county. The Commissioner of Finance of Missouri, the state official charged with the administration of state laws related to banks, opposed the applications. On January 26, 1989, the Comptroller approved them. Two suits challenging this action were then filed in the District Court, one by the State of Missouri, acting through the Commissioner of Finance, and the other by the Independent Bankers Association of America, the Missouri Independent Bankers Association, and The Callaway Bank, a state bank located in one of the counties into which First National Bank wished to branch.

At bottom, the issue is the interpretation of a federal statute, the McFadden Act, first enacted in 1927 and significantly amended in 1933. In its present form, 12 U.S.C. § 36, the Act provides, in pertinent part, as follows:

> A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches ... at any point within the State in which said association is situ-

---

[*] The Hon. H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas, sitting by designation.

[1] The Hon. D. Brook Bartlett, United States District Judge for the Western District of Missouri.

ated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition. . . .

12 U.S.C. § 36(c). And, as previously noted, 12 U.S.C. § 36(h) provides that the words "State banks"

shall be held to include trust companies, savings banks, or other such corporations or institutions carrying on the banking business under the authority of State laws.

Essentially, the Comptroller's position is that, in Missouri, state-chartered savings and loan institutions are, as a practical matter, "carrying on the banking business under the authority of State laws," because they are engaged in providing what amount to checking accounts, and in making commercial loans, much in the way commercial banks do. Traditionally, of course, and originally, savings and loan associations were primarily created to provide a source of credit for home-mortgage financing. They did not accept demand deposits, nor did they make loans on security other than residential real estate. But, as everyone with a nodding acquaintance with the modern development of the financial industry knows, the clear, bright-line distinctions between commercial banks and savings and loans have, over the years, gradually become blurred. Especially since the enactment of the Garn–St. Germain Depository Institutions Act of 1982, Pub.L. No. 97–320, 12 U.S.C. § 1464, savings and loans have increasingly engaged in activities once thought to be the private preserve of commercial banks or trust companies. The record shows that this national development has occurred also in Missouri, though the parties dispute its extent. We need not detail the facts of competition between commercial banks and savings and loan associations in Missouri, which are well set forth in the District Court's opinions. It is sufficient to say that the Comptroller concluded that Missouri savings and loan associations had effectively become "State banks" for McFadden Act purposes.

The question we must decide is whether to approve this interpretation of the statute.

■ The first issue is our scope of review: how much deference must be paid (if any) to the Comptroller's interpretation of the National Bank Act, as amended by the McFadden Act? The plaintiffs, the parties attacking the Comptroller's action here, rely heavily on our opinion in *Dakota National Bank & Trust Co. v. First National Bank & Trust Co. of Fargo,* 554 F.2d 345 (8th Cir.), *cert. denied,* 434 U.S. 877, 98 S.Ct. 229, 54 L.Ed.2d 157 (1977). There, in discussing the interpretation of the term "State banks" by the Comptroller, we did say, as plaintiffs emphasize, that the issue was one of statutory interpretation to be decided de novo by the courts. A panel of this Court may not overrule or ignore a previous panel opinion. In this instance, however, the Supreme Court, in a number of intervening decisions, has made clear that the de novo standard set out in *Dakota National Bank* is not the correct approach. The leading case is *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). There, the Court said:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. at 842–43, 104 S.Ct. at 2781 (footnotes omitted). In a footnote, the Supreme Court added that a court "need not con-

clude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n. 11, 104 S.Ct. at 2782 n. 11. This Court has recently had occasion to apply the *Chevron* standard in a case involving the McFadden Act itself. In the course of upholding an action of the Comptroller, we said, among other things: "The Comptroller of the Currency's interpretation of the National Bank Act is entitled to great deference. *Clarke v. Securities Indus. Association,* 479 U.S. 388, 403–04 [107 S.Ct. 750, 759–60, 93 L.Ed.2d 757] (1987)." *Arkansas State Bank Commissioner v. Resolution Trust Corp.,* 911 F.2d 161, 174 (8th Cir.1990).

■ If the *Chevron* standard is to be applied, and we are convinced that it is, there can be only one result here. The statute is hardly clear on its face. The financial industry is complex and changing. Distinctions long considered basic are fading away. This kind of regulatory and competitive environment is especially suited to the expert judgment of regulators accustomed to dealing with the industry day to day. We think it is well within the bounds of reason for the Comptroller to conclude that the term "State banks" should be given a practical, or functional, definition. And, given the realities of banking in the nineties, it is permissible for him to find that savings and loan institutions do in fact compete significantly with banks, at least in states, like Missouri, which have authorized them to issue negotiable orders of withdrawal (indistinguishable from checks) and, within limits, to make commercial loans.

In reaching this conclusion we follow the lead of the Fifth Circuit in *Department of Banking & Consumer Finance of the State of Mississippi v. Clarke,* 809 F.2d 266 (5th Cir.), *cert. denied,* 483 U.S. 1010, 107 S.Ct. 3240, 97 L.Ed.2d 745 (1987). There, in closely similar circumstances, the Comptroller's theory—that state-chartered savings associations can be "State banks" for McFadden Act purposes—was upheld.[2] Plaintiffs make two basic arguments against the Fifth Circuit's conclusion, neither of which we find persuasive. First, it is contended that the Fifth Circuit's opinion is in conflict with *Dakota National Bank, supra.* In *Dakota National Bank,* we held that the Bank of North Dakota, a state-owned Bank, was not to be considered a "State bank" within the meaning of 12 U.S.C. § 36(c). The purpose of the McFadden Act, we said, was to create competitive equality between two groups of privately chartered institutions: national banks and state banks. It had nothing to do with activities of the sovereign itself. Accordingly, the fact that the state-owned Bank of North Dakota could establish branches throughout the state, while privately chartered state banks could not, did not authorize the Comptroller of the Currency to allow unrestricted statewide branching by national banks in that state. The case is plainly unique and inapplicable to the present situation. As the *Dakota National Bank* opinion itself emphasizes, the McFadden Act is addressed to privately chartered institutions, exactly the situation we have here. The present case does not involve sovereign activities of the state of Missouri in the banking field. We therefore see no conflict between this aspect of *Dakota National Bank* and the opinion of the Fifth Circuit in *Department of Banking, supra.*

In addition, plaintiffs argue that the Mississippi case is distinguishable on its facts. State-chartered savings associations in Mississippi, they say, are allowed to call themselves "banks," unlike state-chartered savings and loan associations in Missouri. Further, Mississippi savings associations were in fact engaged in bank-like activities to a greater extent than Missouri savings and loans are now. For example, plaintiffs assert that as of June 1987 only 3.6 per cent. of the loans made by savings and loan associations in Missouri were non-mort-

---

**2.** For a discussion of *Department of Banking* and its applicability to this appeal, see Hargrave, *National Banks: Branching Where No* *Bank Has Branched Before,* 39 Drake L.Rev. 383, 384–89 (1990).

gage loans, a figure considerably below the comparable number in Mississippi. We do not doubt that these are relevant differences between the two cases, but they are differences of degree, rather than of kind. It is perfectly true that differences in degree often become dispositive in close cases, but that sort of consideration, we think, addresses itself properly in the first instance to the expert judgment of the Comptroller. It is his opinion that the differences between Missouri and Mississippi savings and loan associations are not sufficiently great to justify a different interpretation of the statute. This is not an unreasonable or impermissible view of competitive reality or of the term "State banks," and we are therefore bound, under *Chevron*, to defer to it.

## II.

██ We address separately an argument based on a federal statute enacted after these suits were filed, the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, § 303(a), to be codified at 12 U.S.C. § 1467a(m)(1). In general, the effect of FIRREA will be to require savings and loan associations to increase the proportion of their funds placed in "qualified thrift investments," a category weighted towards residential and manufactured housing. The intention of Congress was obviously to nudge savings and loans back towards their original rationale, the provision of credit for the purchase of homes. As a practical matter the percentage of "portfolio assets" that savings and loans will have to place in qualified thrift investments will increase from sixty per cent. to seventy per cent. Even after this change, however, more than thirty per cent. of a savings and loan association's total assets may be entirely devoted to consumer loans. FIRREA § 301, to be codified at 12 U.S.C. § 1464(c)(2)(D). In addition, FIRREA does not affect at all the ability of savings and loan associations to accept deposits and offer the equivalent of checking accounts. We agree with plaintiffs that the effect of FIRREA is probably to reinforce the distinctions that remain between commercial banks and savings and loans, but we do not agree that the new statute, much of which is not yet effective, is a development sufficiently significant to justify our rejection of the Comptroller's otherwise reasonable interpretation of the McFadden Act. In short, we agree with the District Court that FIRREA did not require it to change its previously announced decision upholding the action of the Comptroller.

## III.

In sum, the judgment of the District Court, upholding the Comptroller's action in permitting the establishment of the two branches in question, will be affirmed. For additional details of reasoning supporting this conclusion, we refer the reader to the various opinions of that Court, to which we have had, in truth, little to add.

Affirmed.